**BANK OF NEWPORT, a California Banking Corporation, Appellant,**

v.

**The FIRST NATIONAL BANK AND TRUST COMPANY OF BISMARCK, a North Dakota Corporation, Appellee.**

No. 82–1184.

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1982.

Decided Sept. 10, 1982.

---

Richard D. Williams, Paul J. Hall, Mary E. Doyle, Manatt, Phelps, Rothenberg & Tunney, Los Angeles, Cal., for appellant.

The Law Offices of Jerome Zamos, Los Angeles, Cal., for appellee The First Nat. Bank and Trust Co. of Bismarck.

Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Bank of Newport appeals from the dismissal by the district court[1] after a bench trial of Bank of Newport's diversity action against First National Bank and Trust Company of Bismarck (First National) for alleged wrongful dishonor of a draft drawn under a letter of credit issued by First National. We affirm the district court.

I

The events leading to this action began when First National at the request of Drs. Robert Honkola, Ralph Honkola, and Richard Fettig (the doctors) issued an irrevocable letter of credit, dated June 30, 1976, in the amount of $125,775.00 to Fiscal Concepts, Inc., a California corporation (Fiscal). The doctors sought issuance of the letter of credit pursuant to an investment program under which they were to provide Fiscal with $60,000.00 in cash and a letter of credit in the amount of $125,775.00 in exchange for the ownership interest in distributorships of coin-operated blood pressure machines. Specifically, the doctors were to receive forty-five blood pressure machines for sale or lease in Minnesota, North Dakota, South Dakota, and Wisconsin.

Fiscal and the doctors agreed that the First National letter of credit was to guarantee the manufacture and delivery of the blood pressure machines and, therefore, should serve as collateral for a second letter of credit issued at Fiscal's request for the benefit of Filac Corporation (Filac), the

---

1. The Honorable Paul Benson, Chief Judge, United States District Court, District of North Dakota.

manufacturer of the machines. However, Fiscal made a commitment to the doctors that the First National letter of credit would never be drawn upon. The First National letter of credit,[2] issued June 30, 1976, provides that the letter was issued "... [f]or guaranty that Drs. Honkola, Fettig, and Honkola will sell 25 BPM–1200 systems in Minnesota, North Dakota, and South Dakota, and 20 like machines in Wisconsin ..." The letter further provides that drafts drawn under the credit must be endorsed and state the reason for the draw.

On June 14, 1976, Fiscal entered into a general loan and blanket collateral agreement with the Bank of Newport, giving the bank a security interest in Fiscal property. At this time, Fiscal also assigned the proceeds of the First National letter of credit to the bank. The doctors were not told of the assignment until the summer of 1977 and of the security agreement until after this action was commenced.

In December of 1976, Bank of Newport issued, at Fiscal's request, a letter of credit in the amount of $125,760.00 to Filac to guarantee the shipment of ninety-six blood pressure machines to Fiscal. The First National letter of credit was designated as collateral for this letter of credit. In March 1977, Fiscal executed a promissory note in favor of the Bank of Newport in the amount of $125,750.00. This note was secured by the proceeds of the First National letter of credit pursuant to the general loan and collateral agreement of June 14, 1976. Bank of Newport made periodic disbursements under this note to cover draws made by Filac on the Bank of Newport letter of credit.

First National first became aware that the letter of credit had been assigned to Bank of Newport as collateral for Bank of Newport loans to Fiscal in July 1977. Consequently, First National's attorney Jerome Zamos wrote Bank of Newport a letter, stating that the First National letter of credit was not to be used as security for any loans by Bank of Newport to Fiscal, that such use would violate the terms of the letter of credit, and that First National would not honor calls upon its letter of credit. In this letter, Zamos referred to the Fiscal's earlier written commitment to the doctors that the First National letter of credit would never be drawn upon and would only be used "to guarantee manufacturing [of the blood pressure machines] in the first instance."

Despite receiving this notice from First National, on September 13, 1977, Bank of Newport prepared a sight draft, executed by Fiscal's president, authorizing First National to pay Bank of Newport $125,775.00 under the letter of credit. The front side of the draft provided that it was "[d]rawn under the First National Bank and Trust Company of Bismarck Letter of Credit # 30 dated 6/30/76 and subsequent amendments thereof." On November 30, 1977, Bank of Newport endorsed the reverse side of the draft, stating that it was "[d]rawn for Letter of Credit face value for application to beneficiary's obligation incurred for the purchase of merchandise in accordance with the letter of credit purpose." When Bank of Newport made this endorsement, it had no knowledge that any blood pressure machines had been purchased by Fiscal for eventual delivery to the doctors and made

**2.** The letter of credit provides as follows:
Gentlemen:
    Our Irrevocable Letter of Credit No. 30 Amount—$125,775.00—U. S. Funds For account of Drs. Honkola, Fettig, and Honkola
    For guaranty that Drs. Honkola, Fettig, and Honkola will sell 25 BPM–1200 Systems in Minnesota, North Dakota, and South Dakota, and 20 like machines in Wisconsin.
The drafts drawn under this Credit are to be endorsed thereon and must bear the clause "drawn under the First National Bank and

Trust Company of Bismarck Letter of Credit No. 30 dated June 30, 1976. [sic]
The drafts drawn under this Credit should state the reason for the draft.
We hereby agree with drawers, endorsers, and bona fide holders of drafts drawn under and in compliance with the terms of this credit that the same shall be duly honored upon presentation at the First National Bank and Trust Company of Bismarck, Bismarck, North Dakota if drawn and negotiated on or before *December 30, 1977.*

no effort to determine whether such purchases had been made. Further, at this time, the Bank of Newport retained possession of some 200 blood pressure machines warehoused pursuant to its blanket security agreement with Fiscal and knew that the doctors had not received their forty-five blood pressure machines as required by the agreement between Fiscal and the doctors, the agreement which was the underlying purpose for the letter of credit.[3]

Bank of Newport subsequently presented the draft to First National along with Fiscal's assignment statement and the letter of credit. First National refused to honor the draft because: (1) the condition of the letter of credit had not been met—i.e., the blood pressure machines had not been delivered to the doctors; and (2) Bank of Newport had received notice that the letter of credit was being improperly used to repay loans from Bank of Newport to Fiscal rather than to guarantee delivery of the machines to the doctors.

The District Court dismissed both of Bank of Newport's claims, holding that First National's dishonor was justified on two independent grounds: First, Bank of Newport failed to provide documentation evidencing delivery of the machines to the doctors as was required under the court's interpretation of the letter of credit. Second, prior to drawing the draft, Bank of Newport had actual knowledge of nondelivery of the machines to the doctors, had possession and control of 200 such machines warehoused pursuant to its security agree-

ment with Fiscal, and had notice that the letter of credit was being improperly used by Fiscal as security for loans from Bank of Newport to Fiscal.[4] As to the second grounds for dishonor, the court concluded that Bank of Newport was "attempting to manipulate the requirements of [the] letter of credit ... to recover its loan to Fiscal without giving up any of the machines it held as collateral."

Bank of Newport now appeals from the district court's dismissal of its claim for wrongful dishonor; it does not appeal the district court's dismissal of its claim for declaratory relief as to its status as a holder in due course.

## II

### (A)

■ This appeal focuses on the question of whether Bank of Newport's draft on the First National letter of credit was tainted by "fraud in the transaction," giving First National the right to dishonor that draft under Uniform Commercial Code § 5–114(2) (N.D.Cent.Code § 41–05–14(2) (1971)).[5] Bank of Newport makes two arguments in support of its position that there was no "fraud in the transaction." First, Bank of Newport argues that it complied fully and truthfully with the terms of the letter of credit by providing the following statement of reason for the draw:

Drawn for letter of credit face value for application to beneficiaries' obligation incurred for purchase of merchandise in

---

3. It was also revealed at trial that at the time the draft was drawn Fiscal was experiencing severe financial difficulties, that the Bank of Newport had made substantial loans to Fiscal, and that the Bank of Newport was closely supervising the Fiscal account.

4. The court further found that:

[P]laintiff had knowledge that delivery of the machines may have been required under the [First National] letter of credit and a number of other letters of credit for the benefit of Fiscal issued for other investors not party to this action. In situations when plaintiff found such letters of credit to be ambiguous

in regard to conditions precedent, plaintiff informed Fiscal of the fact and requested Fiscal to seek revision of the letters of credit to provide simply that funds be used "for general corporate purposes."

5. Because the resolution of this issue will dispose of Bank of Newport's wrongful dishonor claim we need not address the issue of whether the First National letter of credit contained an express condition requiring documentary evidence of delivery prior to payment of draft under the credit.

accordance with the letter of credit purpose.

Bank of Newport urges that the veracity of this statement was not impaired by the fact that the purpose for which the draft was drawn—to repay loans Bank of Newport made to Fiscal—was wholly inconsistent with the purpose for which the letter of credit was issued—to assure delivery of blood pressure machines to the doctors. Bank of Newport further argues that its actual knowledge of nondelivery of the blood pressure machines, its retained possession and control of such machines, and its knowledge of the improper use of the letter of credit did not impair its right to receive payment on the draft presented to First National. Both of these arguments are hinged upon the long-standing principle that a letter of credit is completely divorced from the underlying transaction between the issuing bank's customer (the doctors) and the beneficiary under the letter of credit (Fiscal). *United States v. Sun Bank of Miami*, 609 F.2d 832, 833 (5th Cir. 1980) (per curiam); *Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 885 (3d Cir. 1977); *West Virginia Housing Development Fund v. Sroka*, 415 F.Supp. 1107, 1114 (W.D.Pa. 1976).

■ We do not accept Bank of Newport's arguments and conclude that where, as here, no innocent third parties are involved and where the draft itself and the underlying transaction are tainted with fraud or actual knowledge that the underlying transaction is being wholly thwarted by the beneficiary or its assignee, the draft need not be honored. Under the circumstances here presented, the salutary commercial doctrine of the independence of the letter of credit from the underlying transaction has no application. Bank of Newport, as assignee, stands in the shoes of Fiscal, and obviously Fiscal had no right to draw on the letter of credit without making provision for the delivery of the machines. Bank of Newport, as assignee, only had the right to receive payment on drafts properly drawn by the beneficiary, Fiscal.

(B)

■ A letter of credit is a commitment on the part of the issuing bank that it will pay a draft or demand for payment presented to it under the terms of the credit. *Venizelos, S. A. v. Chase Manhattan Bank*, 425 F.2d 461, 464–65 (2d Cir. 1970). Typically, three separate and distinct contracts are involved:

(1) The contract of the bank (First National) with its customer (the doctors) by which the bank agrees to issue the letter of credit to the beneficiary (Fiscal).

(2) The underlying contract between the customer and the beneficiary which results in the letter of credit issuance.

(3) The letter of credit itself, which is a contract between the issuing bank and the beneficiary by which the bank agrees to pay the drafts drawn under the letter of credit and presented to it by the beneficiary if they are accompanied by the requisite documents.

■ Long-standing case law, codified in the Uniform Commercial Code, establishes that the letter of credit is separate and distinct from the underlying contractual transaction between the issuing bank's customer and the beneficiary. Accordingly, the issuing bank's duty to honor drafts presented for payment is dependent only on the terms and conditions of the letter of credit and not the underlying contract between the bank's customer and the beneficiary. *See Chase Manhattan*, 550 F.2d at 885; *Shaffer v. Brooklyn Park Garden Apartments*, 311 Minn. 452, 250 N.W.2d 172, 179 (Minn.1977). The rule of the independence of the letter of credit from the underlying transaction is based on two policy considerations. First, the issuing bank can assume no liability for the performance of the underlying contract because it has no control over making the underlying contract or over selection of the beneficiary. *Shaffer*, 250 N.W.2d at 179. Second, the

letter of credit would lose its commercial vitality if, before honoring drafts, the issuing bank were obliged to look beyond the terms of the letter of credit to the underlying contractual controversy between its customer and the beneficiary. *See Sun Bank of Miami,* 609 F.2d at 833.

In the instant case, First National's duty to honor Bank of Newport's draft is governed by Section 5–114(1) of the Uniform Commercial Code (N.D.Cent.Code § 41–05–14(1) (1981)), which provides that:

> An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary. . . .

However, Section 5–114(2) of the Uniform Commercial Code (N.D.Cent.Code § 41–05–14(2) (1981)), permits an issuer to dishonor where "fraud in the transaction" has been shown and the holder has not taken the draft in circumstances that would make it a holder in due course.[6] Here, because Bank of Newport does not (and cannot in this factual context) claim holder in due course status, we only address whether or not the defense of "fraud in the transaction" has been shown.

The "fraud in the transaction" defense is a statutory codification of the landmark case of *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (N.Y.Sup.Ct.1941). In *Sztejn,* a letter of credit was issued to a seller to insure payment for a quantity of bristles. The letter of credit provided that drafts would be paid upon presentation of invoices and a bill of lading showing that shipment of the bristles had been made. The buyer who had procured the letter of credit sued to enjoin payment of the drafts drawn under the letter of credit. The buyer's complaint alleged that while the documents complied on their face with the terms of the letter of credit, the seller shipped worthless cowhairs instead of bristles. Thus, the buyer claimed the seller had engaged in "active fraud" in presenting the documents. The seller's correspondent bank who presented the draft moved to dismiss the buyer's injunction claiming that in a letter of credit transaction, the issuing bank was required to honor drafts where the accompanying documents on their face conformed to the requirements of the letter of credit, notwithstanding fraud in the underlying transaction.

The *Sztejn* court denied the correspondent bank's motion. The court stated that although a letter of credit is independent of the primary contract of sale between the buyer and the seller, and a bank is not required to go behind documents presented for payment before honoring drafts, "[t]he application of this doctrine presupposes that the documents accompanying the drafts are genuine." 31 N.Y.S. at 634. The court went on to conclude that where no innocent parties are involved and where the documents and underlying transaction are tainted with intentional fraud, the draft need not be honored, even though the documents conform on their face. The court remarked that "the principle of the independence of the bank's obligation under the letter of credit should not be extended to protect the unscrupulous [beneficiary]." *Id.* 31 N.Y. S.2d at 634. The court accordingly held that a bank presenting a draft on the bene-

---

6. Subdivision (2) of Section 5–114 of the Uniform Commercial provides that,

"[u]nless *otherwise agreed when docu-ments* appear on their face to comply with the terms of a credit but * * * there is fraud in the transaction

(a) the issuer must honor the draft or demand for payment if honor is demanded by a * * * holder of the draft * * * which has taken the draft * * * under the credit and under circumstances which would make it a holder in due course (Section 3–302) * * *; and

(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft * * * despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor."

ficiary's behalf rather than as a holder in due course stood in no better position than the beneficiary charged with fraud.[7] *Id.* 31 N.Y.S.2d at 634–35. In the instant case no goods had been shipped at all.

Courts applying *Sztejn's* "fraud in the transaction" defense, as codified in U.C.C. § 5–114(2), have given varying interpretations to the term "fraud in the transaction." Some courts interpret the "fraud in the transaction" defense to permit an issuer to dishonor where fraud in the *underlying transaction* has been shown *and no innocent parties are involved. See Banco Espanol de Credito v. State Street Bank & Trust Co.,* 409 F.2d 711, 712 (1st Cir. 1969), which held the defense of "fraud in the transaction" is established where the underlying transaction is infected by the beneficiary's fraud and the presenter bank is not a holder in due course. Other cases so holding include: *United Technologies Corp. v. Citibank N.A.,* 469 F.Supp. 473, 478 (S.D.N.Y.1979) (the defense of fraud in the transaction applies where there is a showing of "active fraud" on the part of the seller-beneficiary in failing to perform the underlying contract rather than a mere dispute as to performance); *United Bank Ltd. v. Cambridge Sporting Goods,* 392 N.Y.S.2d 265, 41 N.Y.2d 254, 360 N.E.2d 943, 949–50 (1976) (fraud in the transaction defense applies where the seller-beneficiary fraudulently shipped old, unpadded, nipped and mildewed gloves rather than new boxing gloves as ordered and the presenter of the draft was not a holder in due course).

Other courts have interpreted the "fraud in the transaction" defense to apply only where fraud has been found in respect to the documents presented to the issuer and not as to the underlying transaction. *See,*

*e.g., Bossier Bank and Trust Co. v. Union Planters National Bank,* 550 F.2d 1077, 1082 (6th Cir. 1977). *Sroka,* 415 F.Supp. at 1114; *Shaffer,* 25 N.W.2d at 181.[8]

Bank of Newport urges that the "fraud in the transaction" defense is available only where the required documents presented along with the draft for payment are intentionally misleading or false, and, fraud in the underlying transaction cannot give rise to a defense to payment. Thus, Bank of Newport suggests that the only issue raised in this case is whether the required document, the draft setting forth the reason for the draw, was itself false; and contends that the statement was true, even though the purpose for the draw—to repay Bank of Newport loans to Fiscal—may have been inconsistent with the purpose underlying the letter of credit issuance—delivery of the machines to the doctors.

### (C)

Even accepting Bank of Newport's framing of the issue, we cannot agree that the statement of reason for the draw was itself truthful and that the purpose underlying the letter of credit was of no importance. The statement for the draw may have been artfully worded, but it was in total variance from the purpose of the transaction and not at all in keeping with the obligations of the beneficiary to manufacture and deliver the machines. We analyze this issue in three steps.

First, the purpose underlying the letter of credit is important in determining the truthfulness of the statement of reason because in that statement Bank of Newport explicitly warrants that its draft is "drawn . . . in accordance with the letter of credit

---

**7.** The court in *Sztejn* recognized that fraud in the transaction would not be a defense to payment on a draft where the presenter was a holder in due course who took the draft for value, in good faith, and without notice of the underlying fraud in the transaction. *Sztejn,* 31 N.Y.S.2d at 634, 635.

**8.** One court has interpreted *Sztejn* to permit an issuing bank to dishonor where no innocent parties are involved and where the documents *or* the underlying transaction is tainted with intentional fraud, even though the documents conform on their face to the terms of the letter of credit. *See NMC Enterprises, Inc. v. Columbia Broadcasting System,* 14 U.C.C.Rep.Serv. 1427, 1429 (N.Y.Sup.Ct.1974).

purpose." Clearly, the ultimate purpose behind the letter of credit issuance here was to assure delivery of the machines to the doctors. Bank of Newport's suggestion that the district court found that the letter of credit was intended merely to serve as collateral to secure manufacture of the machines is based on an incomplete reading of the district court's decision. Furthermore, the district court expressly found that Fiscal and the doctors agreed that the letter of credit was issued "to guarantee the manufacture and delivery of the BPM machines." That court also concluded that "it would be incongruous for the doctors to guarantee to sell machines without being able to acquire the machines to complete their sale."

Second, Bank of Newport knew or at least had reason to know that the purpose behind the letter of credit issuance was delivery of the machines to the doctors. The letter of credit itself indicates that its purpose was to "guaranty that the doctors will sell [blood pressure machines]." Even though the language may have been insufficient to impose a documentary evidence of delivery requirement, it clearly put Bank of Newport on notice that the *purpose* underlying the letter of credit issuance was to assure delivery of the machines. Furthermore, as the district court found, "Bank of Newport was intrinsically involved in the financing and supervising of Fiscal Concepts, Inc. . . . and was aware that a number of letters of credit . . . may have required delivery of machines as a condition precedent." In view of Bank of Newport's close supervision over Fiscal's financing, it is reasonable to assume that Bank of Newport was aware of the purpose behind· a sizeable letter of credit made in Fiscal's favor, particularly where Bank of Newport

was an assignee of proceeds under that credit. Finally, the letter sent by First National's attorney Jerome Zamos prior to presentation of the draft put Bank of Newport on notice of the purpose behind the letter of credit. In that letter Zamos indicated that the letter of credit was not to be used to secure loans by Bank of Newport to Fiscal. The Zamos letter also referred to the letter of agreement between Fiscal and the doctors in which Fiscal promised never to draw against the letter of credit.

Third, as the district court found and Bank of Newport conceeds, Bank of Newport had knowledge of nondelivery of the machines when it submitted its draft including the statement of reason for the draw. Furthermore, Bank of Newport made no effort to determine whether any machines were *ever* going to be delivered to the doctors.[9]

Therefore, synthesizing steps one through three, the following conclusion emerges: when Bank of Newport submitted its statement of reason that the draft was drawn "in accordance with the letter of credit purpose," it knew that the purpose for which the draft was drawn—repayment of loans Bank of Newport made to Fiscal—could not possibly be "in accordance with" the purpose for which the letter of credit was issued—delivery of the machines to the doctors. Hence, the statement was itself intentionally inaccurate. However, the real fraudulent effect of this statement is amplified when it is considered in conjunction with Bank of Newport's participation in frustrating the letter of credit purpose by retaining possession and control over the machines rather than shipping them to the doctors.[10] Thus, while expressly warranting on its draft that the draft was made in

---

**9.** No evidence was presented to indicate whether more than the 200 machines which Bank of Newport itself controlled pursuant to its security agreement with Fiscal were ever manufactured. The Bank of Newport officer who provided the statement of reason on the draft testified that when he presented the draft for payment he did not know whether any ma-

chines were being manufactured for delivery to the doctors.

**10.** As mentioned above at the time of presentation of the draft, Bank of Newport had possession of 200 blood pressure machines warehoused pursuant to its blanket security agreement with Fiscal. We do not accept Bank of Newport's assertion that it would have shipped

accordance with the letter of credit purpose, Bank of Newport knew that such purpose would be frustrated by its own refusal to ship the machines.[11] We therefore conclude that Bank of Newport's draft was tainted by "fraud in the transaction"[12] and affirm the district court, with costs assessed against appellant.

Affirmed.

the doctors their machines had it known that delivery was the purpose behind the letter of credit. For the reasons set forth in the opinion, we conclude that Bank of Newport had such knowledge when it presented the draft for payment. Bank of Newport's presently expressed willingness to ship the machines because they are "valueless" in no way detracts from this conclusion.

11. This case is therefore distinguishable from cases Bank of Newport relies upon which hold that the purpose for the draw on a letter of credit need not be consistent with the purpose of the underlying transaction. *Compare Sun Bank*, 609 F.2d at 833, *Pringle-Associated Mortgage Corp. v. Southern National Bank of Hattiesburg*, 571 F.2d 871, 874–75, (5th Cir. 1978); *Sroka* 415 F.Supp. at 1114. Indeed, this case falls squarely within the exception enunciated in *Sztejn* that "the principle of the independence of the bank's obligation under a letter of credit should not be extended to protect the unscrupulous [beneficiary]." *Sztejn*, 31 N.Y. S.2d at 634. Bank of Newport, as an assignee, had a direct interest in payment under a letter of credit, the purpose of which the Bank knew was being frustrated by its own actions. Bank of Newport stands in no better position than Fiscal, which clearly had no right to draw the draft under these circumstances.

12. While not expressly characterizing the Bank of Newport's actions as constituting "fraud in the transaction," the district court did conclude:

It is clear that [Bank of Newport] had control of the machines and was attempting to manipulate the requirements of [the] letter of credit in regard to the machines. [Bank of Newport's] intent was obviously to recover its loan to Fiscal without giving up any of the machines it held as collateral.