UNIVERSAL MARINE INSURANCE COMPANY, LTD., Plaintiff,

v.

BEACON INSURANCE COMPANY, Neill Portermain, New Orleans Reinsurers, Inc., Robert D. Schirmer, B.F.G. Toomey & Associates, Inc., B.F.G. Toomey Associates, Ltd., Barry Toomey and Cherokee Insurance Company, Ltd., Defendants.

CHEROKEE INSURANCE COMPANY, Counterclaimant,

v.

UNIVERSAL MARINE INSURANCE COMPANY, LTD., Counterdefendant.

No. ST–C–83–328.

United States District Court, W.D. North Carolina, Statesville Division.

March 2, 1984.

---

Elliott M. Kroll, New York City, Bruce Freedman, Washington, D.C., for plaintiff.

Thomas P. Kanaday, Jr., Nashville, Tenn., John D. Briggs, III, W. Donald Dresser, Washington, D.C., Robert Cordle, Charlotte, N.C., Rachel L. Steel, Nashville, Tenn., Stephen Ryan, Washington, D.C., David M. Spector, Paul W. Schroeder, Ronald A. Jacks, Chicago, Ill., Katherine D. Woodruff, Wilkesboro, N.C., James E. Walker, Charlotte, N.C., for defendants.

## ORDER

POTTER, Chief Judge.

THIS MATTER was heard before the undersigned on February 13, 14, and 15, 1984 in Charlotte, North Carolina. The Plaintiff was represented by Elliot M. Kroll and Bruce Freedman. The Defendant, Cherokee Insurance Company, ("Cherokee"), was represented by Thomas P. Kanaday, Jr., John D. Briggs, III, W. Donald Dresser, Robert Cordle, Rachel L. Steel, and Stephen Ryan. The Defendant, Beacon Insurance Company ("Beacon") was represented by David M. Spector, Paul W. Schroeder, Ronald A. Jacks, Katherine D. Woodruff, and James E. Walker.

Previously, on February 7, 1984, Defendant Beacon filed a motion for a temporary restraining order prohibiting Defendant Cherokee from filing an action in any court

other than the United States District Court for the Western District of North Carolina attempting to interfere with or prevent Beacon's presentment and draw down on Irrevocable Standby Letter of Credit No. SB 1186, bearing the credit number PB–5286 and Irrevocable Standby Letter of Credit No. 002349, bearing the credit number, PB–3991 ("the disputed letters of credit" issued by American National Bank, the "issuing bank"). After a hearing on February 8, 1984 the Court granted Beacon's motion and further ordered the issuing bank to pay the funds covered by the letters of credit into the registry of this Court and Cherokee to fund the issuing bank with an amount, not exceeding $5,634,750.02 to enable the issuing bank to make payment under the letters of credit into the registry of the Court.

During the February 8, 1984 hearing, Cherokee's counsel indicated that Cherokee intended to seek a restraining order in this Court prohibiting Beacon from obtaining payment of the funds held in the Court's registry. Cherokee filed its motion for a preliminary injunction or a temporary restraining order which gave rise to this hearing held on February 13, 14, and 15th. Also filed with the Court on February 13, 1984, the first day of the hearing, was the Plaintiff's cross-motion for a preliminary injunction or the imposition of a constructive trust over the funds held by the Court and for an additional sum of $2,854,758.98.

 After a full hearing on the matter, the Court, having considered the arguments of counsel, the affidavits, the testimony, the exhibits and the memoranda submitted, enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) On January 6, 1984, the Plaintiff, Universal Marine Insurance Company, Ltd., ("UMIC") moved the Court for a preliminary injunction enjoining Defendant Cherokee from making presentment under a letter of credit issued in favor of Cherokee by the Bank of Nova Scotia and designated as No. 77/43695/82 ("UMIC's letter of credit") on the grounds that there was fraud in the underlying transaction. The letter of credit was for $8,489,509.00 and was scheduled to expire on January 15, 1984. (The Court had, on December 29, 1983, issued a Temporary Restraining Order restraining Cherokee from making presentment of the letter of credit.)

(2) The UMIC letter of credit was issued in favor of Cherokee in accordance with a contract between UMIC and Cherokee, which requires UMIC to provide Cherokee with a letter of credit to secure UMIC's payment of its liabilities under the retrocession agreement with respect to unpaid losses and unearned premium reserves.

(3) The Court dissolved its Temporary Restraining Order and denied UMIC's motion for a preliminary injunction because UMIC failed to prove that its harm outweighs the irreparable harm to Cherokee if Cherokee was enjoined from presenting its draft to draw on the letter of credit. 577 F.Supp. 829.

(4) The Plaintiff appealed the Order to the United States Court of Appeals for the Fourth Circuit. Its appeal was denied.

(5) On December 21, 1983 the Plaintiff obtained a Temporary Restraining Order from the Supreme Court of the State of New York restraining the Bank of Nova Scotia from making or permitting to be made any payments pursuant to the letter of credit pending formal hearing on an application for a preliminary injunction. The hearing was scheduled for January 16, 1984, one day after Defendant Cherokee's right of presentment expired. Cherokee, the beneficiary under the letter of credit who was not originally a party to the New York action, was permitted to intervene.

(6) The Plaintiff sought a preliminary injunction in the New York litigation, on the grounds of fraud. The New York Court denied the Plaintiff's motion, finding that "the Plaintiff has not demonstrated that anything other than a contractual dispute concerning the allocation

of risks and premiums exists." The Court further noted that it "has serious doubts that the Complaint states a cause of action." Thus, the Court denied the Plaintiff's motion for a preliminary injunction. The Court did stay its decision for a brief period so that the Plaintiff's application for relief might be made to the Appellate Division of the Supreme Court of the State of New York. On February 10, 1984, the Appellate Division denied UMIC's application for a stay. Accordingly, the parties that issued the UMIC letters of credit honored the draft previously presented by Cherokee, paying to or for the benefit of Cherokee the sum of $8,489,509.00.

(7) The Plaintiff alleges that the $5,634,-750.02 deposited into the registry of this Court, "although emanating from First American National Bank, are a portion of the proceeds of Plaintiff's Letter of Credit to Cherokee." The record demonstrates, however, that the funds paid into the Court's registry were the funds of First American. Defendant Cherokee used *its* funds to pay First American National Bank and not to pay into the Court.

(8) On August 23, 1979, Cherokee and Beacon entered into an agreement that was originally evidenced by a "Placement Slip." The Slip covered placement of reinsurance business with Cherokee. The Placement Slip provided, among other things, that Cherokee, the reinsurer agreed to establish letters of credit for the benefit of Beacon with respect to "unearned premium reserve, outstanding losses including I.B.N.R. (incurred but not reported losses) and/or as may be required to comply with the requirements of the regulatory authorities."

(9) The Placement Slip also contained a factoring chart to be utilized in computing premium, but no loss, payments attributable to the respective parties.

(10) On June 18, 1980, Beacon and Cherokee executed a Reinsurance Agreement No. QS–00201. This Quota Share Agreement covered placement of the same reinsurance business contemplated in the Placement Slip.

(11) The two agreements, not prepared by the same broker, differ with respect to posting letters of credit and premium allocation. Article XVII of the Reinsurance Agreement provides:

"if the Reinsurer (Cherokee) is unauthorized in any state of the United States of America or the District of Columbia where authorization is required by insurance regulatory authorities, the Reinsurer will fund (providing particulars are received fifteen (15) days prior to the date funding is required by the Company) outstanding losses by either Cash Advances, Escrow Accounts for the benefit of the Company, Bank Letters of Credit which are clean, irrevocable for a period of at least one year ... or a combination thereof, if a penalty would accrue to the Company (Beacon) on its financial statement without such funding. The Reinsurer shall have the sole option of determining the method of funding referred to above provided it is acceptable to the insurance regulatory authority involved."

In addition, the Reinsurance Agreement contemplates that premium and loss distribution be computed in accordance with the common account method and not under a factoring chart.

(12) The parties seriously dispute which agreement, the Placement Slip or the Reinsurance Agreement, covers the parties' obligations and responsibilities. Cherokee introduced evidence tending to show that the Placement Slip only served as an "intent" or "binder" contract that was completely superseded by the Reinsurance Agreement. Beacon produced evidence tending to show that the parties intended the Slip to govern and that their conduct during the relevant time frame demonstrates this intent. Due to the peculiar nature of the reinsurance industry the Court declines at this time to find which contract governed. That contractual dispute is best left to a determination by an insurance arbitrator, know-

ledgeable of the industry practice, or in further disposition of the litigation.

(13) Cherokee's motion is concerned with the two issuing bank's letters of credit, Nos. PB–5286 and PB–3991, issued in connection with the parties' reinsurance transactions.

(14) Irrevocable Standby Letter of Credit, bearing the credit number PB–5286 ("the New York letter of Credit") was caused to be issued by Cherokee in favor of Beacon by the First American National Bank in the amount of $3,400,000.00. It was issued on December 15, 1983 with an original expiration date of January 7, 1984. The expiration date was extended to February 13, 1984 by agreement of the parties in the course of pursuing this motion. The letter provides that drafts drawn under the credit must be accompanied by an affidavit by Beacon attesting that

The sum of U.S. $3,400,000.00 is due and owing to Beacon Insurance Company, Richardson, Texas by Cherokee Insurance Company, Nashville, Tennessee for outstanding losses and/or unearned premiums as specified in reinsurance agreements between the two companies, as negotiated by New Orleans Reinsurers, Inc., Metaire, La.

(15) Irrevocable Standby Letter of Credit bearing the number PB–3991 ("the Dallas letter of credit") was caused to be issued by Cherokee and its parent corporation, in favor of First City Bank of Dallas by the First American National Bank in the amount of $2,234,750.02. It was issued on June 17, 1983 with an original expiration date of December 31, 1983. The expiration date was extended to February 13, 1984 by agreement of the parties in the course of pursuing this motion. The letter provides that drafts drawn on the credit must be accompanied by a "signed and notarized statement from First City Bank of Dallas, Dallas, Texas certifying that funds drawn under this letter of credit will be applied for account of Beacon Insurance Company."

(16) The Dallas letter of credit was a "back-to-back" letter of credit issued by Cherokee for Beacon's benefit to back up Beacon's obligation to the Bank under letters of credit previously caused to be issued by Beacon in favor of other reinsurers by the First City Bank of Dallas.

(17) In July of 1983, Katherine Woodruff, Vice President/Legal Counsel of Beacon, wrote to Robert G. Schirmer, President of New Orleans Reinsurers, Inc., indicating that Integral Insurance Company, a subsidiary of Beacon, was applying in New York for admission as a licensed insurer and/or an accredited reinsurer. Ms. Woodruff indicated that Integral would not be admitted unless Beacon could be qualified in New York. Thus, a letter of credit was needed from Cherokee on Beacon's behalf to avoid penalization of its surplus resulting in lack of accreditation in New York.

(18) Ms. Woodruff cited Article XVII of the Reinsurance Agreement, and not the Placement Slip, as authority for Cherokee's responsibility to post a letter of credit on behalf of Beacon. As previously discussed, Article XVII requires a letter of credit if the reinsurer is not licensed in a state and a penalty would accrue to Beacon.

(19) Cherokee, although apparently licensed in all the states in which Beacon does business under the Reinsurance Agreement, was not licensed in New York.

(20) Cherokee was never informed that the New York letter of credit was indirectly needed to aid Integral in its application. Further, Cherokee does not have any business with Integral and would not have established a letter of credit for the benefit of Integral.

(21) On July 19, 1983, Billy L. Aikin, Senior Vice President and Secretary of Cherokee, wrote Ms. Woodruff that in "accordance with instructions and information from Bob Schirmer" Cherokee would request a letter of credit in the amount of $5,616,289.00 be issued with an expiration date of December 31, 1983. In addition, payment of the fee for the letter of credit was the responsibility of Beacon.

(22) Mr. Aikin wrote this letter on the assurances of Mr. Schirmer that UMIC would increase its letter of credit for the benefit of Cherokee. UMIC did not increase its letter of credit and Cherokee did not issue a letter of credit for $5.6 million.

(23) On November 21, 1983 Mr. Schirmer contacted Cherokee indicating that Beacon needed a letter of credit for its New York application and that a letter in the amount of $3,400,000.00 rather than $5,616,000.00 would suffice. As Cherokee was able to establish a $3,400,000.00 letter without immediately obtaining funds from UMIC, it proceeded to request a letter of credit be issued with Beacon as beneficiary in the amount of $3,400,000.00.

(24) The Court finds that both parties intended that this letter of credit was to be used only to aid Beacon in its application for a license in New York.

(25) The letter of credit was issued December 15, 1983. Prior to its issuance Beacon had entered a "letter of intent" to sell its subsidiary, Integral Insurance Company.

(26) The President of Beacon, Neil W. Portermain, testified that the purpose of the New York letter of credit was for Beacon's application in New York. Mr. Portermain further testified that Beacon had not submitted a formal application in New York because he felt that a formal application was senseless without the letter of credit.

(27) Beacon did not inform Cherokee that on two previous occasions it had applied in New York and been rejected.

(28) On February 3, 1984, the Insurance Department of New York refunded a $1,000.00 application fee to Beacon because the Insurance Department discovered Beacon had no pending application.

(29) Thomas L. Harrison, a director, Vice President, and Secretary of Beacon, stated by affidavit that:

[d]uring the early part of 1983 the principals of Beacon and Cherokee met and agreed, as a business accommoda-tion, that Beacon would not require Cherokee to advance funds on Canadian treaties written by Beacon if Cherokee would establish letter of credit in favor of Beacon's bank, First City (Bank of Dallas), in the amount of $2,234,750.02 to enable First City to accept that letter of credit as collateral for the letters of credit it had issued on behalf of Beacon's reinsureds; the expiration date on the letter of credit established by Cherokee for the benefit of Beacon's bank, First City, was extended at First City's request with the express understanding that should First City have any request for funding under letter of credit issued to Beacon's reinsureds, it would have sufficient time to request funding from First American under the letter of credit established by Cherokee and Dana Corp. before the expiration date of First American's letter of credit.

(30) Mr. Harrison's affidavit is corroborated by his letter of July 14, 1983 to Mr. Aikin indicating that the letter of credit was to serve as collateral for the letters of credit First City issued on behalf of Beacon.

(31) Mr. Aikin, by affidavit, stated Beacon requested Cherokee to give the letter of credit to Beacon's bank, as collateral to secure Beacon's liability, as account party, on fifteen letters of credit which Beacon had caused First City to issue to fifteen insurance companies. Beacon told Cherokee that First City wanted Beacon to provide some collateral for Beacon's obligation to reimburse First City Bank of Dallas if the bank was called upon to honor any of these letters of credit.

(32) Mr. Aikin further states:

[i]t was clear from the conversations concerning the requests that Beacon was asking Cherokee to do this as a favor or an accommodation. Beacon, not Cherokee, paid First American's fees for issuing the letter of credit. Both Beacon and Cherokee knew that Cherokee had no contractual obligation to put up a letter of credit to secure Bea-

con's liability for putting up letters of credit in states where Beacon was not licensed.

(33) Defendant Cherokee issued the letter of credit because Cherokee was the beneficiary of the $8.5 million letters of credit from UMIC. The risks which were secured by the fifteen underlying letters of credit were the same risks which Beacon had ceded to Cherokee and which Cherokee had retroceded to UMIC. Cherokee believed that the same events which would cause the fifteen letters of credit and in turn the Dallas letter of credit to be called upon, would cause UMIC letters of credit in Cherokee's favor to be called upon.

(34) The Court finds that the Dallas letter of credit was issued as an accommodation to Defendant Beacon, to be drawn upon only in the event that the fifteen underlying letters of credit were drawn.

(35) The fifteen underlying letters of credit issued by Defendant Beacon expired without any right of presentment being exercised. Thus, no claim could be made under the fifteen letters of credit.

(36) In December of 1983 when Mr. Portermain received notice of UMIC's lawsuit he "felt Cherokee might be nervous" so he instructed Mr. Harrison to proceed to draw on the letters of credit. Beacon attempted to draw on the letters even though it knew the New York letter was issued only to accomodate Beacon with its New York application and the Dallas letter was to be drawn upon only if the fifteen underlying letters of credit were drawn upon.

(37) Mr. Harrison attempted to draw on the letters of credit in January of 1984. First American National Bank, however, declined to make payment because an injunction issued in Tennessee precluded payment. The parties settling the Tennessee controversy, extended the expiration date of the letters of credit to February 13, 1984.

(38) On February 3, 1984 the New York Department of Insurance informed Beacon that it did not have an application for accreditation before the Department. This fact evidently was not revealed to Cherokee by Beacon. It was not until February 8, 1984 when Cherokee began its own investigation into Beacon's application in New York that Cherokee was advised by the New York Insurance Department that Beacon had no pending application to be licensed as an authorized insurer in New York.

(39) On February 10, 1984 Beacon, knowing: (1) that the New York Application was no longer pending, (2) that the underlying letters of credit secured by the Dallas letter of credit had expired with no liability asserted, and (3) that letters of credit were to be used only to aid Beacon in its New York application and as collateral for fifteen letters of credit now expired, demanded payment under the letters of credit for reasons totally unrelated to their intended purpose. Similarly, Beacon asserts the same rights as to the funds held in the registry of this Court.

(40) Beacon contends it has the right to draw on the letters of credit because an alleged disputed amount is owed by Cherokee to Beacon under the Placement Slip Agreement.

(41) A.M. Best is a corporation that annually evaluates and estimates the financial viability of insurance companies. Based on its investigation A.M. Best issues a "Book" which assigns a rating to the various insurance companies. The 1983 Book is based on the company's financial status in 1982. Cherokee was given a "B" rating which either reflects "good" or "very good". The rating assigned to Beacon is "omitted", which means that Beacon lost its "Best Rating". Mr. Portermain testified that Cherokee did not do anything to cause Beacon to lose its "Best Rating".

(42) In 1983 Beacon failed eight of the eleven IRIS factors. Mr. Portermain testified that Cherokee was not responsible for Beacon's failure to satisfy eight of the eleven IRIS factors.

(43) Both parties presented evidence that the assets or capital of the party not

receiving the funds will be detrimentally impaired, affecting their ability to do business and possibly resulting in receivership or loss of various state licenses. Both parties need the funds to enable them to post other letters of credit for the benefit of their reinsurers. Both parties have corresponding obligations to make payments to their direct insureds. Both parties are subject to the same printing deadlines in preparing their financial statements. Thus, the Court finds that the above possible harms caused by the depletion of funds as to either party will have a substantially similar effect.

(44) If Beacon, however, is not enjoined from receiving payment its precarious financial situation will probably forever bar Cherokee from recovering the funds in the event of success in the litigation. If Beacon is enjoined the status quo is maintained with the funds remaining in the Court's registry. Thus, if Beacon is ultimately successful it will be able to recover the funds from the registry of the Court.

(45) In addition, Beacon's standing in the insurance industry is already tarnished by its own management, not in any manner due to Cherokee, in failing eight of the eleven IRIS factors and losing its "Best Rating". Cherokee, currently has an unblemished standing in the insurance industry. If Defendant Beacon is not enjoined, however, the financial damage to Cherokee may result in Cherokee losing its previous good standing in the insurance industry.

(46) Thus, in balancing the equities between Cherokee and Beacon, the Court finds that the inequity and irreparable harm to Cherokee if Beacon is not enjoined from receiving payment under the letters of credit outweighs the harm to Beacon if enjoined from receiving payment.

## CONCLUSIONS OF LAW

(1) In determining whether a preliminary injunction should be issued to maintain the status quo the moving party, Cherokee, has the burden to satisfy four prerequisites: (1) a substantial likelihood that Cherokee will prevail on the merits; (2) that Cherokee will probably suffer irreparable injury if the interim relief is denied; (3) the injury to Cherokee outweighs the injury to Beacon if the injunction is issued; and (4) granting the injunction must not disserve the public interest. *Wetzel v. Edwards*, 635 F.2d 283, 287 (4th Cir.1980). If the likelihood of success is obviously prevalent, the showing of probability of irreparable injury is lessened. *Id.* Of all the factors, the two most important are the probable irreparable injury to the moving party and the likely harm to the nonmoving party, *id.*, or as otherwise termed the balancing of the equities.

(2) The merits of this case involve letter of credit law. Typically a letter of credit transaction involves three distinct contracts. The first contract is the agreement between the issuing bank and its customer for the issuance of the letter of credit. The second contract is the underlying agreement between the customer and the beneficiary of the letter of credit. The letter of credit is the final contract which arises between the issuing bank and the beneficiary. *Sunset Investments Ltd. v. Sargent*, 52 N.C.App. 284, 278 S.E.2d 558, 561, *petition denied*, 303 N.C. 550, 281 S.E.2d 401 (1981). The contract between the issuer and the beneficiary is independent of the underlying contract between the customer and the beneficiary. *Id.* The purpose of the independence principal is to preserve the usefulness of the letter of credit as a means of facilitating commercial dealings. *Pringle-Associated Mortgage Corp. v. Southern National Bank*, 571 F.2d 871, 874 (5th Cir.1978). Because of the importance of this independence principal, the right of a customer to enjoin payment under a letter of credit is severally restricted. *Universal Marine Insurance, Ltd. v. Beacon Insurance Co.*, 577 F.Supp. 829 (W.D.N.C. Jan. 9, 1984).

(3) Balanced against the commercial sanctity of the letter of credit is the overriding public interest in the prevention of fraud in a letter of credit transaction. Thus, it is well established that the moving party is entitled to an injunction if there is such fraud in the transaction by the beneficiary as vitiates the entire transaction. *See,* U.C.C. 5–114(2); *Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344, 1355 (11th Cir.1982); *Universal Marine Insurance Company, supra.*

(4) The issue that remains to be determined by the Court is what degree of conduct by the beneficiary constitutes fraud in the transaction sufficient to justify enjoining a letter of credit transaction. Beacon argues that, having drawn down on the letter of credit under the terms written on the letter of credit fraud cannot be shown. In other words, it argues that the veracity of its drawn down is not impaired by the fact that Beacon knew that the purpose for which it drew the draft was completely inconsistent with the purpose for which the letters were issued. This argument is even more incredulous when, as here, the facts reveal that the parties agreed that the letters would not be drawn on at all, but would only serve as a temporary accomodation.

(5) An argument similar to Beacon's argument was made in *Bank of Newport v. First National Bank & Trust Co. of Bismarck,* 687 F.2d 1257 (8th Cir.1982). Several individual physicians procured a letter of credit from First National Bank & Trust in favor of Fiscal Concepts, Inc., a corporation in which the physicians were engaged in a commercial venture relating to blood pressure machines. The letter of credit was issued to guarantee that the physicians would sell a specified number of blood pressure machines and was conditioned upon the machines being delivered to the physicians in the first instance.

Fiscal Concepts, Inc., subsequently, entered into a loan agreement with the Bank of Newport. As security for the loan agreement, Fiscal assigned the First National Bank & Trust letter of credit to the Bank of Newport. The Bank of Newport attempted to draw upon the First National Bank & Trust letter of credit procured by the physicians. At the time of the attempted draw, the Bank of Newport did not know whether or not the blood pressure machines had in fact been delivered to the physicians.

First National Bank & Trust refused to honor the draft because the blood pressure machines had not been delivered and because Bank of Newport *knew* that the letters of credit were being improperly used to repay the loans from Bank of Newport to Fiscal rather than to guarantee delivery of the machines. After First National Bank & Trust refused to honor its draft, Bank of Newport instituted an action in Federal Court for payment of the letters of credit. Bank of Newport argued that under the independence principle, its knowledge or improper use of the letter of credit did not impair its right to receive payment on the draft presented. The Court, rejecting Bank of Newport's argument held that:

> [w]e do not accept Bank of Newport's arguments and conclude that where, as here, no innocent third parties are involved and where the draft itself and the underlying transaction are tainted with fraud or actual knowledge that the underlying transaction is being wholly thwarted by the beneficiary or its assignee, the draft need not be honored. Under the circumstances here presented, the salutory commercial doctrine of the independence of the letter of credit from the underlying transaction has no application. *Id.* at 1261.

Since the Bank of Newport knew that the purpose underlying the issuance of the letter of credit was delivery of the blood pressure machines and further did not know if delivery had been made, the Bank of Newport was attempting to wholly thwart the underlying transaction by attempting to call the letter of credit. *Id.* at 1256–59.

As was the situation in *Bank of Newport,* in the present situation, Beacon is fraudulently attempting to obtain payment under the letter of credit under circumstances totally contrary to the agreement by the parties. Both letters of credit were given as an accomodation. The New York letter of credit is no longer needed to secure the New York application because there is no pending New York application. The Dallas letter of credit no longer serves its purpose, because the underlying letters of credit have expired and were never drawn on. The Court is of the opinion, that for Beacon to intentionally convert funds established solely to accomodate Beacon in two specific instances which no longer exist, simply because the letters of credit are within its reach constitutes such fraud as vitiates the entire transaction. The Court, therefore concludes, based on the facts presented, that there is a substantial likelihood of Cherokee prevailing on the merits by showing fraud on behalf of Beacon.

(6) The three remaining prerequisites for issuing an injunction have all been shown to the Court as stated in its findings of fact. Cherokee has shown a probability of irreparable harm if Beacon receives the money. In balancing the equities between Cherokee and Beacon, Cherokee has shown that the harm to it outweighs the harm to Beacon if the status quo is not preserved pending final disposition of the litigation. The public interest against encouraging or tolerating fraud can be protected only if an injunction is issued. If an injunction is not issued, the Court, in effect, would be rewarding the fraudulent party to the detriment of Cherokee and its innocent insureds. Therefore, Cherokee is entitled to a preliminary injunction maintaining the status quo. Accordingly, the funds shall remain in the Clerk's account.

(7) Fed.R.Civ.P. 65(c) requires the Court to order the applicant to post security if an injunction is issued. The actual funds in dispute having been placed with the Court will obviously serve as security for any damages and costs arising from payment due under the letters of credit. After the hearing was completed, Beacon returned to the Court and requested additional security for alleged damages beyond the amount reflected in the letter of credit. At the time of Beacon's request it had not presented any evidence with respect to the alleged damage and could only speculate as to the amount of possible damages. The Court, therefore, informed Beacon that if evidence was tendered with respect to its request the Court would consider whether additional security was necessary. Therefore, the Court reserves the right to increase the amount of security if the necessary proof is presented.

(8) Turning finally to the Plaintiff's cross motion for a preliminary injunction or the imposition of a constructive trust over the funds paid under the letter of credit issued by the Plaintiff, UMIC, the Court is of the opinion that the motion should be denied. The Plaintiff has already gone to four different courts in an attempt to restrain Cherokee's right to receive payment under the letter of credit. There is not any allegation that the Plaintiff was not afforded a full opportunity to present its claim in its previous motions. The fact that the funds have been lawfully converted from a letter of credit to currency does not change the matter. The Supreme Court of the State of New York found that the Plaintiff failed to show any fraud on behalf of Cherokee with respect to the letter of credit. Having fully raised and litigated the issue of fraud in the New York litigation collaterally estops the Plaintiff from being able to seek a different determination in this Court. The Plaintiff has had four bites of the apple and is now seeking its fifth. This Court, however, under the doctrine of collateral estoppel, cannot and will not, allow the Plaintiff to relitigate a matter already determined in the Plaintiff's New York litigation.

IT IS, THEREFORE, ORDERED that:

(1) The Plaintiff's motion is DENIED;

(2) Defendant Cherokee's motion for a preliminary injunction is GRANTED;

(3) All funds held in the account of "Thomas J. McGraw, Clerk of the United States District Court, No. 001–620–285, at NCNB National Bank of North Carolina," which account contains the proceeds from the disputed letters of credit, be kept in the Clerk's account pending a final determination in this cause as to the rights of the parties with respect to the funds.

(4) The Court reserves the right to increase the amount of security if the necessary proof is presented justifying an increase.