# Richmond

CONSOLIDATED SALES COMPANY, INCORPORATED V. BANK OF
HAMPTON ROADS.

January 21, 1952.

Record No. 3876.

Present, Hudgins, C. J., and Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Christian, Barton, Parker & Boyd, A. C. Epps* and *R. Harvey Chappell, Jr.,* for the plaintiff in error.

*Montague, Ferguson & Holt* and *William L. Carleton,* for the defendant in error.

MILLER, J., delivered the opinion of the court.

The Consolidated Sales Company, Incorporated, hereinafter called Consolidated, instituted action by notice of motion for judgment against the Bank of Hampton Roads, hereinafter called the Bank, to recover the sum of $1,763.61. Neither party demanded a jury, and the case was tried by the court. Recovery of the sum sued for or any part thereof was denied, and from that judgment this writ of error was awarded.

In December, 1945, Holland Radio Company, a retail electrical appliance dealer of Newport News, Virginia, hereinafter referred to as Holland, opened an account with Consolidated, a distributor of electrical appliances with its place of business in Richmond, Virginia. Consolidated placed a credit limit of $200 on this account, and business relations on that basis were engaged in between the two companies. To increase its purchasing ability, Holland approached the Bank, which is located in Newport News, Virginia, and had it write Consolidated a letter, the material parts of which follow:

"Bank of Hampton Roads
Newport News, Virginia
\* \* \* \* \* \*

"May 24, 1946

"Consolidated Sales Company
308 North Laurel Street
Richmond, Virginia

"Gentlemen:

"Our customer, the Holland Radio Company of this city, has been granted a line of credit of a substatial amount with this bank for the purpose of floor planning their purchases of major appliances. Mr. Holland has asked that we write you and explain the method to be used in making payment to you for his purchases.

"If you will draft on the Holland Radio Company at this bank,

attaching bill of lading or invoice, drafts will be honored and remittance made on the day received, thus avoiding the necessity of your shipping on an open account.

"We trust that this arrangement will be of benefit both to Mr. Holland in allowing him to take advantage of any cash discounts you might offer, and to yourselves in obtaining prompt payment on your sales to our customer. This arrangement will remain in effect until you are notified to the contrary.

"Yours very truly,

WILLIAM L. TODD

/s/ W. L. Todd,

Asst. Cashier

WLT/evp

CC: HOLLAND RADIO COMPANY"

Immediately after this letter was written Holland secured seven Customer's Draft forms from the Bank which it delivered to Consolidated, and thereafter that company made various shipments of electrical appliances to Holland and mailed the invoices therefor directly to the Bank, for which it made payment by sending its checks to Consolidated. A draft was attached to each of the first seven invoices, but after these had been used, Consolidated merely mailed the invoices (which disclosed the items purchased, date and amount due) to the Bank, and it continued to forward checks in payment therefor.

Though all of the seven drafts were used during the year 1946, throughout 1947 and until April 5, 1948, eighteen to twenty shipments were made by Consolidated to Holland for which payments were made by the Bank upon receipt of the invoices alone.

Included in these numerous shipments for which the Bank paid were such appliances as washing machines, electrical heaters, radio phonographs and vacuum cleaners. Most of these articles were billed at more than $50 each, but in several shipments some articles were priced at considerably less than that sum. On every shipment to Holland, invoices (and on the first seven, drafts) were mailed to the Bank and payment made by it in all except five instances. These five shipments for which no remittance was made to Consolidated were under the respective dates, for the enumerated articles, and at the prices stated below:

| | | | |
|---|---|---|---:|
| 11/26/47 | 2 washing machines, 2 electric heaters | $ | 203.48 |
| 12/ 3/47 | 20 vacuum cleaners.................... | | 797.40 |
| 3/15/48 | 4 washing machines.................. | | 324.88 |
| 3/19/48 | 1 radio phonograph.................. | | 112.97 |
| 4/ 5/48 | 4 washing machines.................. | | 324.88 |

$1,763.61

The Bank admits receiving invoices of 12/3/47, 3/15/48, and 3/19/48, totaling $1,235.25, and though the evidence discloses that Consolidated mailed the two invoices of 11/26/47 and 4/5/48, aggregating $528.36, to the Bank, they were never received by the addressee.

There was some disagreement as to just what was intended to be included by the term "major appliances," but it is agreed that the phrase "floor planning their purchases" means the execution and giving by the purchaser to the Bank of a trust receipt upon the invoiced appliances. This trust receipt is a written promise by the purchaser to pay to the order of the Bank on demand a stated sum of money and an agreement to hold the goods as trustee for the Bank's benefit until payment.

It also appears that upon receipt of each shipment by Holland, that was paid for by the Bank, a trust receipt was executed before any remittance was made to Consolidated, and in no instance was payment made by the Bank if the trust receipt had not been first executed by Holland to secure it. However, as to the shipment of December 3, 1947, of twenty vacuum cleaners, Holland offered to execute a trust receipt, but the Bank declined to floor plan (accept trust receipt on) these articles because it said they were not major appliances. Upon the trial it offered the testimony of William L. Todd, the assistant cashier of the Bank, who said that he did not consider vacuum cleaners at $39.00 major appliances, and they had not meant to include thirty dollar items as major appliances. Yet the evidence shows that before December 3, 1947, the Bank had accepted trust receipts upon several occasions on appliances of no greater sale price than $39.00, some of which were vacuum cleaners, and had floor planned and remitted to Consolidated for other articles of no greater value than $23.90.

The evidence discloses that at no time subsequent to May 24, 1946, did any correspondence, written communication, telephone conversation or conference pass or take place between Con-

solidated and the Bank other than the seven drafts and the numerous invoices mentioned, and the checks in payment therefor, until after May 11, 1948, on which latter date Holland was adjudged a bankrupt.

We must therefore construe the letter of May 24, 1946, and determine from it and the actual transactions and dealings of the parties made in pursuance thereof what liability, if any, was imposed upon the Bank to pay Consolidated for the five shipments in question, or any of them.

Consolidated insists that the writing is a commercial letter of credit which imposed liability upon the Bank, in each instance upon the performance by Consolidated of two conditions, *i. e.*:

1) Shipment of major appliances by it to Holland, and

2) Mailing of a draft with invoice attached. And it says that as to these five shipments, no draft had to accompany the invoices because the sending of a draft had been waived by the Bank by its having paid in numerous instances after the seven drafts had been exhausted.

The Bank contends that the first paragraph of the letter discloses that credit was to be extended by it to Holland solely ''for the purpose of floor planning their purchases of major appliances.'' It also says that this phrase contemplated the execution of a trust agreement upon the articles purchased by Holland from Consolidated securing the Bank in each instance before remittance was to be made to Consolidated, and that execution of the trust agreement was a condition precedent to the imposition of any liability upon it to remit. In short, it says that at most the letter was no more than a conditional guarantee, and the condition imposed to execute a trust receipt was not consummated on any of the five shipments and thus no liability to pay was incurred.

It further asserts that the twenty vacuum cleaners that made up the shipment of December 3, 1947, were not ''major appliances,'' and assigns that as an additional reason why no liability exists as to the item of $797.00.

It also now advances as a defense restrictions imposed upon it by section 6-23, Code of Virginia, 1950, and asserts that under that section it had neither the power nor authority to guarantee or obligate itself to pay an unlimited amount of money for an unrestricted period of time. It is then contended that if appellant's construction of the letter is adopted, it will have that

effect, and for that reason the obligation assumed therein was and is ultra vires and no legal liability has been incurred.

 It definitely appears that on all of the numerous shipments made subsequent to the first seven, no draft was sent with the invoices. The trial court held that by continuing to make payment upon receipt of the invoices alone, the Bank had waived the provision in the letter which specified and had theretofore required that a draft accompany each invoice. With that conclusion we agree.

"As between the seller and the Bank, if the acts amounting to the waiver have been performed by both the buyer and the bank, the bank is obligated to pay the seller without the performance of the conditions waived. This would also hold true if the bank alone be considered to have waived the conditions." Finkelstein: *Legal Aspects of Commercial Letters of Credit*, p. 209 (1930).

However, the trial court concluded that the twenty vacuum cleaners shipped December 3, 1947, were not "major appliances," and for that reason the Bank was not obligated to either floor plan or pay for them under the terms of the letter. It was also of opinion that the language in the first paragraph of the letter which is that Holland "has been granted a line of credit of a substantial amount with this bank for the purpose of floor planning their purchases of major appliances" imposed a condition that had to be complied with before any liability was incurred by the Bank. The court held that the execution of a trust receipt (floor planning) by Holland on the appliances received, securing the Bank, in each instance was a condition precedent to imposition of any liability upon the Bank to pay, and because that had not been done in any of the five instances, there could be no recovery.

A letter of credit is thus defined by the following authorities:

"A letter of credit may be defined as a written instrument by which the writer requests or authorizes a person to whom it is addressed to pay money or deliver goods to a third person and which evidences an agreement whereby the writer assumes responsibility for payment to the addressee of the amount of the debt. Otherwise stated, a letter of credit is a letter authorizing the addressee to pay money or supply a commodity to a third person on the credit of the writer." 24 Am. Jur., Guaranty, sec. 20, p. 888.

"A letter of credit is a letter whereby one person requests some other person to advance money or give credit to a third person, and promises to repay the same to the person making the advancement. It partakes of the nature of a negotiable instrument." *Second Nat. Bank* v. *Samuel & Sons,* 12 F. (2d) 963, 966, 53 A. L. R. 49.

"For the purpose of this action, however, a commercial letter of credit may be defined as a letter wherein the writer agrees to pay or undertakes that some other person will pay a designated amount of money in cash in exchange for specified shipping documents." *Kingdom of Sweden* v. *New York Trust Co.,* 197 Misc. 431, 96 N. Y. S. (2d) 779, 787.

"A commercial letter of credit is normally, though not necessarily, issued in favor of a third party, usually a seller of goods, designated by the customer on whose behalf the credit is issued. Commercial letters of credit are issued in a great variety of forms, and are made available in a great many ways. The essential object in every case is the same—to evidence to a selected correspondent, or to bankers generally, the nature of the credit which the opening bank has committed itself to extend to its customer." *Ernesto Foglino & Co.* v. *Webster,* 217 App. Div. 282, 216 N. Y. S. 225, 234, quoting with approval Wilbert Ward, *American Commercial Credits* (N. Y. 1922) p. 9.

The character, scope and legal effect of letters of credit are discussed in Finkelstein, *Legal Aspects of Commercial Letters of Credit* (1930), McCurdy, *Commercial Letters of Credit,* 35 Har. L. Rev. 539 (1922), Thayer, *Irrevocable Credits and International Commerce: Their Legal Effects,* 37 Col. L. Rev. 1326 (1937), Campbell, *Guaranties and Suretyship Phases of Letters of Credit,* 85 U. of Pa. L. Rev. 176 (1936-37), and Zollman, *Banks and Banking* (Permanent Edition 1936).

■ From these authorities it appears that the specific character of contractual relation, if any, that results between the issuer of a letter of credit and the party to whom it is issued, is dependent upon the intent of the parties as disclosed by the terms of the instrument and the performance or non-performance of any conditions that may be imposed. Whether it be a contract of suretyship or of guaranty (distinguished in decisions cited in 5 Michie's Digest, Guaranty, sec. 4, p. 266) or some more separate and independent undertaking is to be determined by a consideration of the phraseology of the writing, the object

sought to be accomplished, and the precise obligation and conditions imposed upon and assumed by the parties thereto.

In *Moore* v. *Holt,* 10 Gratt. (51 Va.) 284, the following writing termed a letter of credit was found to be a contract of suretyship. It reads:

"Botetourt, Va.

"Merchant
Richmond, Va.

"Dear Sir:

"My brother, Joseph W. Holt, is coming to Richmond to purchase goods, and, because he is unacquainted there, I request my correspondents to introduce him to some of the houses at which I have dealt with assurance that any contract of his will and shall be promptly paid.

"Yours truly,
"Samuel P. Holt"

The writer of that instrument was held directly and primarily responsible to the "Merchant" who had relied thereon and furnished goods on the faith of the writer's undertaking.

In the two cases of *Wadsworth* v. *Allen,* 8 Gratt. (49 Va.) 174, 56 Am. Dec. 137, and *Tischler* v. *Hofheimer, Son & Co.,* 83 Va. 35, 4 S. E. 370, each writing, or letter of credit, involved requested and authorized the addressee to deliver to a designated party goods for which the writer promised to pay. The instrument in question was held in both instances to be a contract of guaranty, but in the former case the writer agreed to pay if the buyer did not, and imposed the condition that he be notified in case of default. In the latter case no issue arose as to the specific character of the instrument, but the primary question was whether it had been revoked, and the court held that it was a continuing guaranty but had been revoked.

Certain rules of construction often resorted to in the interpretation of contracts are likewise applicable to letters of credit. Among them are that the practical construction of a writing adopted and acted upon by the parties thereto is to be given consideration and where there is doubt as to its meaning, that construction adopted and acted upon by the parties must prevail. *Kiser* v. *Amalgamated Clothing Workers,* 169 Va. 574, 194 S. E. 727, 114 A. L. R. 1291; *First Nat. Exchange Bank* v. *Roanoke Oil Co.,* 169 Va. 99, 192 S. E. 764.

■ A further canon of construction applicable to letters of credit, as to other contracts is that in case of ambiguity or uncertainty, the instrument must be construed most strongly against the writer.

With reference to the specific application of the latter rule of construction to a bank's letter of credit, the following is stated in 8 Zollman, *Banks and Banking* (1936) 15:

"Like any other writing, it will be construed most strongly against the writer and so as to be reasonable and consistent with honest intention."

Nor need a bank's letter of credit be in any specific form:

"At the request of its customer the bank issues directly to the seller or to the seller's bank its promise to pay a sum of money on being furnished with certain documents. This promise 'is not required to be in any particular form.' " 2 Williston, *Sales* (1948) 806.

■ We find no merit in the Bank's contention that it was not obligated to pay for the twenty vacuum cleaners because of its belated conclusion that they were not major appliances. It had by its previous course of conduct of floor planning and paying for some vacuum and other appliances of no greater value accepted, acquiesced in and acted upon the construction placed on the term "major appliances" by both seller and purchaser. Thus prior to December 3, 1947, it construed its own letter and agreed that the term "major appliances" included vacuum cleaners. It could not thereafter on the ground assigned take the position, without prior notice to the seller, that such articles were not major appliances and thus avoid payment. To conclude otherwise would have the effect of allowing the bank to change at will the construction and effect of its own letter which had been previously attributed to it and acted on by all interested parties and thus change its legal obligations thereunder whenever it so desired, and when to do so would be to the prejudice of another party to the agreement.

Nor do we think that as between Consolidated and the Bank, execution of a trust receipt by Holland to the Bank was required before its liability to Consolidated attached. When fairly interpreted under the canons of construction applicable thereto, the recital in the first paragraph of the letter, *i.e.*, "Our customer, the Holland Radio Company of this city has been granted a line of credit of a substantial amount with this bank for the

purpose of floor planning their purchases of major appliances,'' is merely a statement of the reason for the obligation assumed by the Bank in the second paragraph. In the latter paragraph there is a direct and unequivocal offer and undertaking by the Bank to pay stated in definite terms, and what is required of Consolidated is also clearly set forth.

Though as between the Bank and Holland it may have been contemplated and agreed that a trust receipt be executed, yet that is not made a condition precedent in the letter to the Bank's liability to Consolidated.

■ The contract or agreement made in a letter of credit between a bank and the seller is distinct and separate from the contract between the bank and purchaser except insofar as the terms of its agreement with the latter are distinctly made a part of the contract with the seller. *Crocker First Nat. Bank* v. *De Sousa,* (9th Cir. 1928), 27 F. (2d) 462; *Huber & Co.* v. *Lalley Light Corp.,* 242 Mich. 171, 218 N. W. 793; and 9 C. J. S., Banks and Banking, 388, note 11.

''The law is that a bank issuing a letter of credit like the one here involved cannot justify its refusal to honor its obligation by reason of the contract relations existing between the bank and its depositor.'' *American Steel Co.* v. *Irving Nat. Bank* (2d Cir. 1920), 266 F. 41.

''The issuing bank has incurred a distinct, independent obligation contingent upon the performance of certain conditions contained in the letter of credit.'' Finkelstein, *supra,* at p. 32.

''The sales contract is an agreement between the buyer and the seller. The letter of credit is a. contract between the issuing bank and the seller and those holding under him. These two arrangements are distinct and independent of each other.'' Finkelstein, *supra,* at p. 223.

■ The writing of May 24, 1946, upon the faith of which shipments were made by Consolidated to Holland and drafts therefor with invoices attached presented to the Bank, did not strictly speaking create a contract whereunder the Bank was a surety for Holland, for here the relationship and obligation existing between the Bank and the seller is distinct from that existing between the Bank and the purchaser, Holland. It is, however, in our opinion a commercial letter of credit wherein a direct, primary and independent promise to pay was made by the Bank to Consolidated conditioned solely upon presentation of a

draft and invoice to the Bank evidencing a shipment of major appliances by Consolidated to Holland. *Bridge* v. *Welda State Bank* (1927), 222 Mo. App. 586, 292 S. W. 1079; Thayer, *Irrevocable Credits and International Commerce: Their Legal Effects*, 37 Col. L. Rev. 1330. As the evidence conclusively establishes that the presentation of a draft with each invoice was waived by the Bank, its liability attached in each instance upon presentation of an invoice alone.

It is conceded that as regards the five shipments in question, the invoice was received by the Bank in three instances, but the evidence discloses that in the other two instances, though mailed, the invoices were never received. Appellant contends that because the Bank's offer to Consolidated in its letter of credit was communicated by mail, an acceptance thereof constituting a binding contract was consummated upon the posting of each invoice, whether or not it was ever received by the Bank. *Cobb* v. *Dunlevie* (1908), 63 W. Va. 398, 60 S. E. 384; *Campbell* v. *Beard* (1905), 57 W. Va. 501, 50 S. E. 747; *Vassar* v. *Camp* (1854), 11 N. Y. 441; 12 Am. Jur., Contracts, sec. 46, page 538.

With that contention we cannot agree.

The offer specified presentation of a draft (with invoice attached) which was to be promptly honored and remittance promptly made. The negotiable character of the instrument designated and the language used negative the conclusion that the offer could be accepted by merely mailing a draft and invoice. They indicate that no obligation was intended to be assumed by the Bank to pay unless and until the draft and invoice had been received. We are unwilling to construe the offer so as to require payment of a negotiable instrument before it was presented or even if it were never presented. Nor do we think that the fundamental character of the Bank's obligation to Consolidated was changed when it waived presentation of a draft and made payment upon receipt of an invoice alone, so that it became liable upon the mere mailing of the invoice. As between the parties, waiver of presentation of the draft merely resulted in their treating the invoice as if it were a draft, and therefore it was still contemplated and intended that it be received in each instance before the obligation arose to pay.

We therefore find no legal duty on the Bank to pay for the shipments of 11/26/47 and 4/5/48 amounting to $528.36, for which it never received the invoices.

■ The Bank's final contention that if the language of the letter of credit imposed an obligation on the Bank to pay Consolidated, it would create a liability to pay unlimited sums for an unrestricted period, and so be beyond the power of the Bank as defined in section 6-23, Code of Virginia 1950, and thus *ultra vires,* was not relied on in the court below. The record does not disclose that this defense was presented in that court, nor is any cross-error incident thereto assigned, so whatever be its merit, if any, it may not under Rule 1:8 of this court be now considered.

For the reasons assigned, the judgment appealed from will be reversed and judgment entered here in favor of Consolidated against the Bank for $1,235.25, with interest thereon from the 21st day of November, 1950, the date of final order in the trial court, and for costs.

*Reversed and final judgment.*