**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**MERCANTILE NATIONAL BANK AT
DALLAS, Defendant-Appellee.**

**No. 85–1514.**

United States Court of Appeals,
Fifth Circuit.

July 28, 1986.

I. Avrum Fingeret, U.S. Dept. of Energy, Washington, D.C., Marvin Collins, U.S. Atty., and Charles Ory, Asst. U.S. Atty., Dallas, Tex., for U.S.

Courtenay L. Bass, Winstead, McGuire, Sechrest & Minick, Michael L. Parham, Dallas, Tex., for Mercantile Nat. Bank at Dallas.

Before GEE, POLITZ and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

This case requires us to apply Texas commercial law to determine whether the United States committed fraud in presenting for payment a letter of credit given as a payment guarantee in a sale of oil from its reserves. Reviewing the law convinces us that the Government's actions, while perhaps constituting a careless way of doing business, do not approach the unscrupulous conduct required to constitute fraud. This being so, we reverse the trial court's summary judgment for appellee and remand the case.

On June 27, 1980, the Department of Energy ("DOE") and OKC Corporation ("OKC") entered into a contract pursuant to 10 U.S.C. § 7430, which empowers the DOE to sell crude oil from naval petroleum reserves to qualified small refineries. Under the contract, the DOE was to ship daily 443 barrels to OKC through a pipeline of Amoco Pipeline Company ("Amoco"). Because the contract required a payment guaranty, OKC had its bank, Mercantile National Bank of Dallas ("Mercantile"), draw up an irrevocable letter of credit for $543,000. The letter of credit, in turn, required the DOE, should it present the letter of credit for payment, to certify either that it delivered oil for which OKC has not paid or that OKC wrongfully rejected delivery.

At first, everything ran smoothly; invoiced at its designated address for each

shipment, OKC paid its bills regularly. The situation changed on January 2, 1981, when OKC sold its refinery division to Basin Refining, Inc. ("Basin"). OKC instructed Amoco to change all designations of crude oil inventories, pipeline appellations, exchange balances, and crude oil balances from OKC's name to Basin's. By letter dated January 15, 1981, OKC's counsel informed the DOE of the sale and requested the following:

> OKC Corp. and Basin request that the right to purchase crude oil be transferred to Basin and that OKC Corp. be released from its obligations to purchase crude oil inasmuch as OKC Corp. no longer owns a crude oil refinery. OKC Corp. would also request that once Basin has furnished DOE with an acceptable letter of credit that the DOE permit OKC Corp. to revoke the Irrevocable Letter of Credit issued by Mercantile National Bank Dallas to the DOE for OKC Corp.

In acknowledging receipt of this notice, the DOE stated that it would accept novation of the contract if Basin provided a new letter of credit. Because Basin failed to comply, however, the novation never occurred.

The DOE nevertheless continued as before to execute its contractual duty by tendering oil at the Amoco pipeline. It also continued to invoice OKC, which forwarded the bills to Basin. For shipments between January 1 and May 19, 1981, Basin paid the DOE by wire transfer. Payments ceased, however, after May 19; on June 6, moreover, Basin filed a voluntary chapter 11 petition in bankruptcy court. To recoup the money owed for shipments occurring after May 19, the DOE sought to draw on OKC's letter of credit. Knowing that OKC no longer owned a refinery and being told by OKC that the delivery certification was fraudulent, Mercantile refused to honor the draft.

Claiming wrongful dishonor, the DOE brought this action against Mercantile to recover the amount of the draft, plus interest. As defenses, Mercantile asserted both its good faith belief of fraud and actual fraud. The district court first concluded that mere notice of fraud by itself was an insufficient reason to disobey a bank's duty to honor a draft presented for payment, a duty imposed by Tex.Bus. & Comm. Code § 5.114. It nevertheless entered summary judgment for Mercantile, ruling that the facts show the DOE's knowledge of a *de facto* contractual relationship with Basin; this being so, certification that it delivered oil to OKC for which OKC has not paid amounted to a fraudulent misrepresentation. On appeal, we review this legal conclusion.

■ The district court and the parties assumed that Texas law governs this case. Agreeing, we nevertheless warn all to reach choice of law conclusions only after due deliberation. The district court's jurisdiction here stemmed from 28 U.S.C. § 1345, which empowers it to hear cases in which the United States is plaintiff. The dictates of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), are therefore inapplicable. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973). Instead, *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), and its progeny govern; "the right of the United States to seek legal redress for duly authorized proprietary transactions 'is a federal right, so that the courts of the United States may formulate a rule of decision.'" *Little Lake Misere*, 412 U.S. at 593, 93 S.Ct. at 2397, *quoting* Friendly, In Praise of *Erie*—And of the New Federal Common Law, 39 NYU L.Rev. 383, 410 (1964). A federal rule of decision, however, does not necessarily preclude the application of state law. Although unbound by *Erie*, a court formulating a federal rule of decision may yet "borrow" state law. *E.g. Little Lake Misere*, 412 U.S. at 594–95, 93 S.Ct. at 2397–98. Whether we apply state law in this way is "a question of federal policy.... [T]he answer to be given necessarily is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon

them of applying state law." *Id.* at 595, 93 S.Ct. at 2398, *quoting United States v. Standard Oil Co.,* 332 U.S. 301, 309–10, 67 S.Ct. 1604, 1609, 91 L.Ed. 1067 (1947). Borrowing Texas law in this case is appropriate. Its law on letters of credit stems from adoption of Article V of the Uniform Commercial Code, now the law in all fifty states. Texas caselaw on the defense of fraud, moreover, is in line with the decisions of other states. Because uniformity of the Government's obligations appears unthreatened by applying Texas law, we conclude to do so.

■ On appeal, our focus is on Mercantile's defense of actual fraud. Under Tex. Bus. & Comm. Code Ann. § 5.114, the issuer of an irrevocable letter of credit may dishonor a draft presented for payment if a document accompanying the draft is fraudulent.[1] The DOE replies, however, that a § 5.114(b)(2) is inapplicable because no fraud occurred. As the argument goes, certification that the DOE delivered oil to OKC was true because it had complied with the contract, tendering oil at the Amoco pipeline; what OKC did with the oil after it was properly tendered is allegedly of no concern to DOE and irrelevant to determining whether fraud occurred. The Government's argument is premised on the assumption that compliance with its contractual duties goes far toward disproving the existence of fraudulent intent.

We cannot accept this assumption so quickly, however. As Mercantile points out, the letter of credit between it and the DOE is independent of the underlying contract. *See Pringle-Associated Mortgage Corp. v. Southern National Bank,* 571 F.2d 871, 874 (5th Cir.1978). A court therefore generally "should not resort to those underlying agreements in interpreting a letter of credit." *Id.* Reliance on *Pringle-Associated* is misplaced, however, because it was not a case involving fraud. In arguing that we cannot refer to the contract in interpreting the letter of credit, Mercantile mistakes the purpose of our inquiry. Ours is not the chore of interpreting a document's terms; in dealing with allegations of fraud, we must decide whether the DOE's actions, in the light of contractual duties established, amount to intentional misrepresentation. Because *Pringle-Associated* does not restrain our review, we accept the DOE's assumption.

■ *GATX Leasing Corp. v. DBM Drilling Corp.,* 657 S.W.2d 178 (Tex.Civ.App.— San Antonio 1983, no writ), governs an inquiry into what constitutes fraud in a § 5.114 case. The court there essentially held that fraud consists of nothing less than a conscious and egregious decision to deceive another. Discussing *Sztejn v. J. Henry Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (1941), the *GATX Leasing* court found that fraud was predicated on "the unscrupulous and intentional failure of a seller to perform in any manner whatsoever its obligations under the underlying contract." 657 S.W.2d at 183. In reviewing the case before it, the court went on to rule that no fraud occurred because "it cannot be said that the appellants have committed anything approaching the intentional or unscrupulous conduct which would deprive the appellees of any benefit of the underlying contract." *Id.*

We arrive at the same conclusion. The facts suggest that the DOE may have

---

1. Section 5.114 provides in part:
   (b) [u]nless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform ... or is forged or fraudulent or there is fraud in the transaction:
   \* \* \* \* \* \*
   (2) in all other cases against its customer, a issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud....
   Comment 2 to § 5.114 makes clear the great leeway an issuer has:

   When, however, no innocent third parties as defined in subsection (a) are involved [in other words, when we are considering subsection (b)(2) ] the issuer is no longer under a duty to honor; but since these matters frequently involve situations in which the determination of the fact of the non-conformance may be difficult or time-consuming, the issuer if he acts in good faith is given the privilege of honoring the draft as against its customer....

known that, after January 2, 1981, Basin—not OKC—was the real beneficiary of the contract. Mercantile presented no evidence, however, that the DOE ever tried to act dishonorably. It simply performed faithfully as the contract required, continuing to deliver oil to the Amoco pipeline. Abiding by an agreement that the other party has apparently breached is scarcely unscrupulous. Indeed, because OKC and Basin never complied with the terms imposed as prerequisites for novation, it is difficult to see that DOE was called upon to give the contract any effect whatever. This would be a different case had the DOE tried to certify deliveries that in fact had not occurred. Such a hypothetical, which would raise a legitimate issue of fraud, demonstrates by comparison how tame were any errors of the DOE. Even assuming that continuing oil deliveries after learning of OKC's possible argument could be seen as blameworthy, it was, if anything, a mere peccadillo compared to the deception that may properly constitute fraud. To bar the Government from recovering on the letter of credit, furthermore, would effectually endorse OKC's assignment, one made contrary to both the terms of the contract and 41 U.S.C. § 15; our unwillingness to let OKC ignore its legal and contractual obligations with impunity leads to a corresponding reluctance to characterize the DOE as the villain of this tale. We think the more just view is that, having never released OKC by novation, the DOE continued to deliver to OKC and maintained the right to have resort to OKC's letter of credit as security for payment.

▮ Mercantile also reiterates the argument that its good faith belief of fraud, standing alone, sufficed as justification for dishonoring the draft. We agree with the district court's contrary conclusion that notice of fraud, standing alone, is insufficient to justify dishonor. Both the text of § 5.114 and the accompanying comments indicate that an issuer will be liable for wrongful dishonor unless, at the time of dishonor, it has proof that the documentation is fraudulent. Failing to posit notice of fraud as grounds for dishonor,

§ 5.114(b) applies only when "a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title ... or of a security ... or is forged or fraudulent or there is fraud in the transaction...." Although § 5.114(b)(2) allows the issuer to honor the draft "despite notification from the customer of fraud, forgery or other defect not apparent on the face of the document," this does not mean that such notification also allows the issuer to dishonor the draft if in fact the notice incorrectly reports that fraud exists. Rather, the language of § 5.114(b)(2), which gives the issuer leeway in deciding whether to honor, assumes that fraud or any of the other evils listed in § 5.114(b) exists. Comment 2 to § 5.114 confirms this interpretation; even if notified, the issuer may still honor the draft because "the determination of the fact of the non-conformance may be difficult or time-consuming...." Recognition that the investigation may be arduous suggests that a duty to investigate before deciding to dishonor in fact exists. Mercantile's argument is therefore unpersuasive.

In short, we find that the court erroneously concluded that the DOE's actions constituted fraudulent misrepresentation; its summary judgment for Mercantile is therefore REVERSED and the case is REMANDED.