**AIRLINE REPORTING CORPORATION, Plaintiff–Appellant,**

v.

**The FIRST NATIONAL BANK OF HOLLY HILL, Defendant–Appellee.**

No. 86–2631.

United States Court of Appeals,
Fourth Circuit.

Argued May 7, 1987.

Decided Oct. 29, 1987.

---

John Randolph Pelzer (Pelzer & Algar, P.A., Charleston, S.C., on brief), for plaintiff-appellant.

G. Dana Sinkler (Sinkler, Gibbs & Simons, Charleston, S.C., on brief), for defendant-appellee.

Before RUSSELL and WILKINSON, Circuit Judges, and HOFFMAN, United States District Judge for the Eastern District of Virginia, sitting by designation.

DONALD RUSSELL, Circuit Judge:

The Airline Reporting Corporation ("ARC") is appealing the district court's Order dismissing the ARC's action against The First National Bank of Holly Hill (Bank) for wrongful dishonor of a letter of credit. This case requires the court to apply South Carolina commercial law to determine whether the district court was correct in finding that the ARC committed fraud in drawing on a letter of credit given by the Bank as a guarantee of payment by a travel agency for tickets distributed to the agency for resale. We find that the ARC did not commit fraud and reverse.

## I. FACTS

The ARC began operation on January 1, 1985 as the successor entity of the Air Traffic Conference of America ("ATC"). The ARC, as did the ATC before it, administers sales by travel agencies of airline tickets and payment to the airlines for tickets sold by the agencies. The ARC accredits travel agencies, issues plates for validation purposes and issues airline ticket stock to accredited agencies. The accredited agencies report their ticket sales weekly, and the ARC drafts their accounts ten (10) days after each reporting period to pay the appropriate airlines.

The terms of the relationship between the ARC and travel agencies are delineated in the Agents' Handbook provided to accredited agencies which contains the Passenger Sales Agency Agreement. The Agreement "governs the terms and conditions under which an agent for any member is authorized to sell or issue [airline tickets]...." As defined in the Agreement, the Handbook contains "rules, regulations and instructions of members covering an agent's responsibilities and activities under the agreement...." The Agreement provides, *inter alia*, that: (a) all agencies located in the United States are required to maintain a bond or letter of credit, (b) the same bond or letter of credit covers branch locations as well as the home office, (c) the Agreement may not be assigned by an accredited agency to another agency without the ARC's approval, and (d) generally, a proposed new owner of a home or branch office must submit the standard application and a bond or letter of credit to attain accreditation. The Handbook, expanding upon the agent's responsibilities under the Agreement, states that the accredited owner of an agency remains liable for the actions of the new owner until the ARC approves the new ownership:

The traffic documents and airline plates remain the liability of the present owner until approval of the new ownership or entity is granted. Agency operations must continue without interruption and approval of the new ownership is contingent upon satisfactory evidence that all requirements of Resolution 90.3 have been met. The present owner(s), under the provisions of the Agreement, is held responsible for all acts of the agency until such time as ATC enters into an agreement with the new owner(s).... If the change of ownership requires a new bond, ATC will not process the change until the bond has been received.... Additionally, the present bond must not

be cancelled until approval of the new ownership has taken place.

Wilson Travel Service, originally a sole office in Summerville, South Carolina, became accredited in 1975 when it was a sole proprietorship owned by Hugh Wilson, Sr. Mr. Wilson had provided the ATC with a bond to guarantee payment by the agency. In 1976, Mr. Wilson, with the prior approval of the ATC, sold the agency to his son, Hugh Wilson, Jr. In April 1982, Wilson Travel purchased Ketchum Travel Service of Charleston which it then operated as a branch of Wilson Travel. The ARC approved the change of ownership and required no new bond. On May 21, 1982, Wilson Travel obtained a letter of credit for the amount of $43,000 from the Bank. This credit was later increased to $50,000 on May 16, 1983. The ARC provided the format for the letter of credit which provided in part:

2. Any draft(s) drawn by you under this Letter of Credit shall be accompanied by a letter executed by an authorized official (or one describing himself or herself therein as an authorized official) of the Air Traffic Conference ("ATC") stating as follows: Claims have been submitted or may be submitted to ATC by members of ATC for airline accountable documents ("tickets") sold by the referenced travel agency for gross sales of air transportation, less earned commissions, wholly within the United States which remain unpaid by the travel agency, and the funds represented by the attached draft(s) are required for the protection of ATC and its members.

The letter of credit was referenced to Wilson Travel Service, Summerville, South Carolina, ATC Code # 93872–2. Each approved branch is given its own ATC Code number for purposes of tracking ticket sales. Wilson's Ketchum Office had a distinct ATC Code number which was not referenced in the letter of credit.

As a condition of issuing the letter of credit, the Bank required collateral from Wilson Travel. Accordingly, a mortgage on Hugh Wilson, Jr.'s home was assigned by the First National Bank of South Carolina to the Bank. The Bank, however, failed to perfect its interest in the collateral, so it lay vulnerable to significant loss if its letter of credit was drawn upon by the ARC.

In August 1983 Wilson Travel filed a written notification with the ARC of a change in location and name for the Ketchum branch. The branch was to be relocated at Charleston Airport and renamed Wilson Travel d/b/a Airport Travel. Also in 1983, Hugh Wilson formed a closely held corporation called ARW, Inc., together with Bruce Abbott. Wilson, *without approval by the ARC* and without obtaining a new letter of credit for the corporation, transferred ownership of Airport Travel to the corporation. In May 1984, again without alerting the ARC, Abbott and Wilson severed their business relationship, and Abbott became the sole owner of Airport Travel which was owned as a branch of Abbott Travel Service, Inc. Abbott opened a new bank account under the name of Airport Travel from which the ARC could make drafts. The ARC did not require a new bond or letter of credit from Abbott since it was still unaware of a change in ownership from Wilson's sole proprietorship.

In October or November 1984 the ARC became aware of the true ownership of Airport Travel. The ARC attempted to work with Abbott to obtain accreditation for the airport office, but Wilson apparently refused to cooperate. Thus, in December 1984 the ARC attempted to recover the ticket stocks and plates held by Abbott for Airport Travel. Abbott resisted, but the ARC finally recovered the items in January 1985, and the airport office closed.

Subsequently, three drafts on Airport Travel's bank account were dishonored, amounting to a loss to the ARC of $25,-263.38. Since the Agent's Handbook provided that Wilson Travel remained liable for the actions of its unaccredited transferee, the ARC, by letter dated March 8, 1985, attempted to recover on the letter of credit it held to guarantee payment by Wilson Travel. Using the language provided in the letter of credit, it reported the ticket

sales made by Abbott's airport office as sales made by Wilson Travel. The Bank, by letter dated March 26, 1985, refused to honor the letter of credit after discovering that the ticket sales were not from Wilson Travel's Summerville office but were in fact made by an entity separate from Wilson Travel.

The ARC, therefore, brought suit against the Bank on September 17, 1985, for wrongful dishonor of the draft. The Bank answered that under the commercial law of South Carolina it was not obligated to honor the draft because the ARC's attempt to draw on the letter of credit was fraudulent. *See* S.C.Code Ann. § 36–5–114(2). The Bank argued that (a) the letter of credit covered only the Summerville office of Wilson Travel and (b) that the letter of credit could not cover sales made by Airport Travel because that office was distinct from the Summerville office and was no longer associated with Wilson Travel Service. The ARC argued that under the Agency Agreement entered into by Wilson Travel and the ARC, the letter of credit covered all offices of Wilson Travel and that under the Agents' Handbook, Wilson Travel was liable for the ticket sales of Airport Travel because the ARC had never approved the change in ownership.

The court, following a non-jury trial, held for the Bank and dismissed the ARC's claim. The court examined S.C.Code Ann. § 36–5–114(2) to determine whether the Bank properly dishonored the letter of credit. That section provides in part that an issuer of a letter of credit need not honor a draft upon presentation when "documents appear on their face to comply with the terms of a credit but a required document ... is forged or fraudulent or there is fraud in the transaction."

The court found that the ARC's conduct in presenting the letter of credit to the Bank for payment constituted fraud in the transaction such that the Bank was justified in dishonoring the letter of credit. The court first determined that the letter of credit was meant to cover only the specific office of Wilson Travel indicated on the letter, that being the Summerville office,

because the ARC code number on the letter of credit referred only to the Summerville office. Based upon this determination, the court found that the ARC's attempt to collect for ticket sales made by the airport office was fraudulent. Further, the court found that the ARC allowed Bruce Abbott to continue operating Airport Travel after it discovered that the agency was under new ownership and, hence, was unaccredited. Finally, the court found that the ARC was aware of the true owner of Airport Travel Service (Bruce Abbott) when it presented the draft to the Bank and yet still tried to collect on Wilson Travel's letter of credit. The ARC's knowledge, the court found, further evidenced the fraudulent nature of the transaction. Accordingly, the court dismissed the ARC's claim. The ARC is appealing that dismissal, alleging that its attempt to draw on the letter of credit was not fraudulent because its actions were proper under the Agency Agreement between the ARC and Wilson Travel and under the Agents' Handbook.

## II. DISCUSSION

### A. *Letters of Credit*

Resolution of the issue before us requires that we examine the nature of the transactions between the Bank, the ARC and Wilson Travel. A letter of credit involves three parties: (a) the buyer (customer), (b) the bank (issuer) and (c) the seller (beneficiary). General letters of credit, by which an issuer at the request of a customer issues a letter in favor of the beneficiary promising to accept drafts or to pay the customer's obligation to the beneficiary, have long been used to facilitate international and domestic commercial transactions. The essence of the letter of credit is that the issuer replaces the customer's promise to pay with its own promise to pay upon the beneficiary's timely presentation of conforming documents. The issuer, of course, does not act gratuitously for it normally takes a security interest in collateral of the debtor and charges a fee for the arrangement.

The letter of credit in issue here is in the nature of a standby letter of credit by

which an issuer agrees to pay only if the customer fails to make payment upon proper and timely demand. *See Arbest Constr. Co. v. First Nat'l. Bank & Trust Co.,* 777 F.2d 581 (10th Cir.1985). The letter provided that the Bank would honor drafts on the letter for unpaid claims against Wilson Travel relating to ticket sales made by that agency.

The commercial law of South Carolina is substantially codified, and the law on letters of credit is adopted from Article 5 of the Uniform Commercial Code. As defined in S.C.Code Ann. § 36–5–103(1)(a), a letter of credit is "an engagement by a bank or other person made at the request of a customer ... that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." Although the letter of credit is issued to guarantee the customer's obligation under an underlying contract between the customer and beneficiary, the letter of credit is a distinct transaction between the issuer and beneficiary, and the issuer's obligation under the letter of credit is independent of the underlying transaction unless the letter of credit expressly incorporates that transaction. *See United States v. Mercantile Nat'l. Bank at Dallas,* 795 F.2d 492, 495 (5th Cir.1986); *Pringle–Associated Mortgage Corp. v. Southern Nat'l. Bank,* 571 F.2d 871, 874 (5th Cir.1978). In view of this reality, "[a]n issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract ... between the customer and the beneficiary." S.C.Code Ann. § 36–5–114(1). In other words, an issuer's duty to pay arises exclusively from the terms of the credit with no defenses beyond those terms; its liability rests upon whether the beneficiary has complied with the terms of the credit. *See Banco Nacional De Desarrollo v. Mellon Bank, N.A.,* 726 F.2d 87, 91 (3d Cir.1984); *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 236 (5th Cir.1983), *reh'g denied,* 720 F.2d 1291 (1983); *Bank of Newport v. First Nat'l. Bank & Trust Company of Bismarck,* 687 F.2d 1257, 1261 (8th Cir.

1982); *Chase Manhattan Bank v. Equibank,* 550 F.2d 882, 885 (3d Cir.1977).

An issuer's duty to its customer extends only to ascertaining that the documents presented by the beneficiary appear to be regular on their face. If they so appear then the issuer must honor the draft. S.C. Code Ann. § 36–5–114, South Carolina Reporter's Comments. Section 36–5–114(2), however, provides that an issuer need not honor a draft "when documents appear on their face to comply with the terms of a credit but a required document ... is forged or fraudulent or there is fraud in the transaction," and the presenter of the draft letter is not a holder in due course.

The issuer bears the burden of proving the fraud if it alleges fraud as a defense to an action for wrongful dishonor. It is undisputed that the ARC's draft letter facially complied with the terms of the letter of credit. Our task, therefore, is to determine whether the Bank has proved that the circumstances surrounding the ARC's call on the letter of credit established fraud in the transaction.

B. *The Fraud Exception to an Issuer's Duty to Honor*

The fraud exception to an issuer's duty to honor a facially conforming draft accompanied by appropriate documentation is necessarily a narrow one because broad exceptions to an issuer's obligation would severely limit the utility and purpose of letters of credit. *Itek Corp. v. First Nat'l. Bank of Boston,* 730 F.2d 19, 24 (1st Cir. 1984). Although there is a dearth of case law in South Carolina dealing with the limited fraud exception under S.C.Code Ann. § 36–5–114(2), we can look with some assurance to other jurisdictions because all other states have, like South Carolina, adopted substantially verbatim the U.C.C. provisions concerning letters of credit. The fraud in the transaction exception and fraudulent or forged document exception to an issuer's duty to honor drafts on its letter of credit are the two types of fraud exceptions recognized in U.C.C. § 5–114(2) and its counterpart, S.C.Code Ann. § 36–5–114(2). For the sake of clarity, we will

briefly distinguish these two bases of fraud. *See* Annotation, *What Constitutes Fraud or Forgery Justifying Refusal to Honor, or Injunction Against Honoring, Letter of Credit Under U.C.C. § 5–114(1)(2)*, 25 A.L.R. 4th 239 (1983 & Supplement 1986).

The fraudulent or forged document exception is applicable when the beneficiary attempts to call the letter of credit and the draft or accompanying documents required under the terms of the letter are forged or fraudulent. Thus, in *Prutscher v. Fidelity Int'l. Bank*, 502 F.Supp. 535 (S.D.N.Y. 1980), the court allowed the issuer to dishonor a draft on its letter of credit because the terms of the credit required that when drafting on the credit the beneficiary present the bill of lading as proof of the sale, and the beneficiary submitted a forged bill of lading when making its draft. Similarly, in *O'Grady v. First Union Nat'l. Bank*, 296 N.C. 212, 250 S.E.2d 587 (1978), the court enjoined the issuer to dishonor a draft because the letter of credit required that to call the letter the beneficiary must present the letter along with the note it purported to secure, and the beneficiary substituted the original note with another that omitted an endorser's signature.

The fraud in the transaction exception differs from the fraudulent document exception in that the former looks to the underlying transaction between the customer and beneficiary. "This exception recognizes the unfairness of allowing a beneficiary to call a letter of credit under circumstances where the underlying contract plainly shows that he is not to do so." *Itek Corp.*, 730 F.2d at 24. The exception is construed narrowly and applies only in circumstances so egregious in nature as to vitiate the entire underlying transaction so that the "legitimate purposes of the independence of the issuer's obligation would no longer be served." *Roman Ceramics Corp. v. Peoples Nat'l. Bank*, 714 F.2d 1207, 1212 n. 12, (3d Cir.1983) (quoting *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316, 324–25 (1975); *New York Life Ins. Co. v. Hartford Nat'l. Bank & Trust Company*, 173 Conn. 492, 378 A.2d 562 (1977) (requir-

ing egregious fraud). Courts have held that the issuer has the burden of proving at least an active intent to defraud, *United States v. Mercantile Nat'l. Bank at Dallas*, 795 F.2d 492, 495 (5th Cir.1986); *KMW Int'l. v. Chase Manhattan Bank*, 606 F.2d 10, 16 (2d Cir.1979); *Wyle v. Bank Melli*, 577 F.Supp. 1148, 1162 (N.D.Cal.1983), and that there was no plausible or colorable basis under the underlying contract for the beneficiary to call the letter of credit. *Itek Corp.*, 730 F.2d at 25. Yet even proof of intentional deception and lack of a colorable basis for the draft may not justify dishonor if the beneficiary's conduct is not so egregious as to vitiate the underlying transaction. *Roman Ceramics*, 714 F.2d at 1212, n. 12, *quoting Intraworld*, 336 A.2d at 324–25.

## C. *Application of the Law to the Case*

Having set forth the guiding principles of law, we must now review the factual findings of the district court and then apply the ultimate facts and findings to the operative principles previously discussed. The district court found that the letter of credit covered only the Summerville office of Wilson Travel and that the ARC attempted to call the letter of credit though (a) it knew that the tickets were not sold by the Summerville office, (b) it knew that the airport office was owned by Bruce Abbott and (c) it allowed Abbott to continue to operate the office after discovering that the office was unaccredited. The court noted the liability provision in the agreement between Wilson Travel and the ARC but determined that the provision was not a basis for the ARC's claim given its findings concerning the credit letter's coverage and the ARC's knowledge. The court apparently reasoned that the ARC's failure to close the airport agency upon discovery of its unaccredited status constituted a waiver of its rights under the liability provision and that even if the provision was not waived it was not a basis for the ARC's claim because the provision was applicable only to the actions of an unaccredited transferee of the Summerville office. Based upon these findings, the court concluded that the

ARC's draft constituted fraud in the transaction.

We believe that the district court misconstrued the extent of the Bank's liability under the letter of credit. That letter, by its express terms, covered claims against Wilson Travel for tickets sold by the "agency" and did not limit coverage to a particular office of that agency. But whether the letter of credit covered all offices of Wilson Travel or only the Summerville office is not important to our decision because this case turns on whether the ARC committed fraud given the liability provision in the underlying agreement. The Agents' Handbook, which clarifies the responsibilities of Wilson Travel under the Agency Agreement, expressly provides that the actions of an unaccredited transferee (Bruce Abbott) are imputed to the accredited transferor: "The present owner(s), under the provisions of this agreement, is held responsible for all acts of the Agency until such time as ATC enters into an agreement with the new owner(s)...." Hence, under a literal reading of the underlying agreement between the ARC and Wilson Travel, Wilson Travel was responsible for the acts of Airport Travel, including its ticket sales, although Airport Travel was owned by Bruce Abbott. It does not matter whether the letter of credit covered only the Summerville office, for the liability provision in the underlying agreement imputed Abbott's sales to Wilson Travel, and Wilson Travel's Summerville office was the only office of Wilson Travel still in existence when Abbott defaulted.

The district court was concerned that the ARC allowed Abbott to continue operating the airport agency despite its knowledge of Abbott's failure to obtain accreditation. It found that by doing so the ARC had waived any right that it may have had to collect from Wilson Travel. The issue before the district court, however, was not whether the ARC had a legal right to recover from Wilson Travel for Abbott's ticket sales. That is a matter to be litigated between the ARC and Wilson Travel. The issue was whether the ARC acted fraudulently in calling the letter of credit.

Given the terms of the underlying contract, the terms of the letter of credit and commercial realities, the ARC acted reasonably and in good faith in drawing upon the letter of credit. There is no indication of an intent to defraud the Bank or Wilson Travel, and certainly the ARC's conduct was in no way egregious. The draft presented to the Bank by the ARC was facially valid and in conformance with the letter of credit. The Bank, therefore, was obligated to honor the draft absent fraud. In arguing that we cannot refer to the underlying contract when interpreting the Bank's liability under the letter of credit, the Bank mistakes the purpose of our inquiry. "Ours is not the chore of interpreting a document's terms; in dealing with allegations of fraud, we must decide whether the [ARC's] actions, in the light of contractual duties established, amount to intentional misrepresentation" so egregious as to vitiate the entire underlying transaction. *United States v. Mercantile Nat'l. Bank at Dallas*, 795 F.2d 492, 495 (5th Cir.1986). It is an accepted principle of commercial law that the issuer need not and normally should not look to the underlying transaction before honoring an apparently conforming draft. But the issuer cannot take the drastic step of dishonoring a conforming draft on the basis of fraud without examining the underlying agreement to determine the existence or nonexistence of a colorable basis for the draft. As stated by the court in *Mercantile*, when discussing language identical to Section 36–5–114(2):

> [N]otice of fraud, standing alone, is insufficient to justify dishonor.... [E]ven if notified [of possible fraud], the issuer may still honor the draft because "the determination of the fact of the non-conformance may be difficult or time-consuming...." Recognition that the investigation may be arduous suggests that a duty to investigate before deciding to dishonor in fact exists.

*Id.*, 795 F.2d at 496.

Thus, though the Bank's obligation stemmed from the letter of credit rather than from the underlying transaction, when the Bank received notice that the ticket

sales had in actuality been made by Abbott, the Bank, before dishonoring the draft on the ground of fraud, was obligated to look to the underlying contract to determine whether the ARC had a colorable or plausible basis for calling the letter or was acting to defeat the letter's legitimate purpose. This the Bank failed to do. Simple investigation would have revealed that the ARC's actions were not intentionally deceptive, egregious or in contravention of the purpose of the letter of credit but, instead, were prompted by a colorable claim consistent with the very purpose of the letter of credit—to protect the ARC from Wilson Travel's default on its obligations resulting from ticket sales attributable to Wilson Travel. *See Bank of Newport v. First Nat'l. Bank,* 687 F.2d 1257, 1263–64 (8th Cir.1982). Accordingly, we find that the Bank wrongfully dishonored the ARC's draft.

D. Damages

■ Paragraph Three of the letter of credit states: "Your acceptance of this Credit will constitute your agreement to repay to us within (6) six months after your receipt of the funds paid to you hereunder to the extent that such funds exceed the total amount of claims paid by you to members of the ATC for unpaid tickets." The Bank's improper dishonor of the ARC's draft entitles the ARC to recover from the Bank the face amount of its draft (together with incidental damages and interest) to the extent of the claims outstanding against Wilson Travel for Abbott's ticket sales. S.C.Code Ann. § 36–5–115(1).

Accordingly, we reverse and remand to the district court for entry of judgment in accordance with this opinion.

1. The drafts were issued as follows:

| Report Period | Date of Draft (Check) | Amount |
| --- | --- | --- |
| 12/23/84 | 1/02/85 | $11,260.12 |
| 1/06/85 | 1/16/85 | 3,849.50 |
| 1/13/85 | 1/13/85 | 3,717.68 |
| | TOTAL | $18,827.80 |

On March 8, 1985, ARC drew its draft against the letter of credit for the full amount of the letter of credit, same being in the sum of $50,000.00. The original complaint, filed September 17, 1985, demanded judgment in the sum of

REVERSED and REMANDED WITH DIRECTIONS.

HOFFMAN, District Judge, concurring and dissenting, in part:

While initially I was inclined to affirm the district court's judgment, the ably prepared majority opinion and my independent research of the law convinces me that the issuer (First National Bank of Holly Hill) of the letter of credit has no available defense on the issue of liability as far as the beneficiary (Airline Reporting Corporation) is concerned. In a minor detail, I do dissent from the majority's ruling on the computation of damages.

The particular problem presented in this case is that three of the four claims [1] giving rise to the default under the terms of the letter of credit occurred solely by reason of the actions of Abbott in issuing drafts or checks on his area bank which were returned for insufficient funds. In the interim period, and prior to the default by reason of drawing drafts or checks which were returned for insufficient funds, Wilson, doing business as Wilson Travel Service, had completely withdrawn from the travel agency business. The home office, at Summerville, South Carolina, had been abandoned by Wilson in favor of his wife, Betty Wilson, when Wilson walked out of the office in May 1984, because of the marital separation involving Betty Wilson. Wilson's interest in the branch located at the Charleston Airport was terminated, effective June 6, 1984, by a contract of sale between Wilson and Abbott dated July 9, 1984, when Wilson sold his interest in the Charleston Airport business to Abbott, and Abbott sold his interest in the Columbia Airport branch agency to Wilson. In August 1984, Wilson sold his Columbia Air-

$18,827.80. On February 13, 1986, leave was granted to file an amended complaint to assert additional damages and, at that time, plaintiff asserted additional damages of $6,415.58 due for unreported airline tickets sold in May and June, 1984. The plaintiff also claimed incidental damages, interest, attorneys' fees and costs. While this latter item of $6,415.58 was not presented to the bank at the time the draft on the letter of credit was issued, this potential defense was clearly waived by the bank.

port travel agency business to Pal Traveling Tours in Columbia.

The majority apparently does not think it significant to discuss the later authorized and accepted change of ownership of the home office from Wilson to Betty Wilson. It clearly appears that the change of ownership of the home office was approved and accepted by ARC at some time prior to December 14, 1984. The Air Traffic Conference Change of Ownership Application, signed by Wilson and Betty A. Wilson, as the former and proposed new owner respectively, was received by ARC on some date after September 30, 1984. Plaintiff's Ex. 33 demonstrates that the Air Traffic Conference Verification of Accountable Documents was verified by ARC on November 13, 1984. Betty Wilson had posted a bond for her solely owned corporation, Wilson Travel Service, Inc., which bond was effective September 1, 1984. Under Resolution 90.3, as amended in July 1984, pertaining to change of ownership, the Administrator is given no sooner than 30 days, and no more than 60 days, *after receipt of the application*, within which to execute an agreement with the new owner. While Resolution 90.3 is, in itself, contradictory in many respects, it is obvious that there was a legal and binding obligation upon ARC, through its Administrator, to execute the new agreement with Betty Wilson as all of her papers were in perfect order, her bond had been posted, and she was operating as Wilson Travel Service, Inc., with the full approval of ARC and its Administrator. This is evidenced by Plaintiff's Ex. 36, a mailgram dated December 6, 1984, sent to Wilson Travel Service, doing business as Airport Travel Service (being solely operated by Bruce Abbott since June 6, 1984), in an attempt to complete all forms, no later than December 14, 1984, to effectuate the Charleston location of Wilson Travel Service, doing business as Airport Travel Service, as the new home office of Wilson Travel Service. In this mailgram, Mellott of ARC stated that "Failure to submit proper forms by deadline [December 14, 1984] will result in removal of all ticket stock and airline plates *since we must honor ownership chg [change] of Home Office.*"

ARC was in a bind. It had received in proper form, strictly in accordance with the many requirements of the "Passenger Sales Agency Agreement," all of the required documents and bond from Betty Wilson and her newly formed corporation, Wilson Travel Service, Inc. The sixty-day period for approval by the Administrator would be reached by December 14, 1984.[2] Despite the many provisions of the Sales Agency Agreement, there was no apparent resolution of what happens to a branch office when the home office no longer exists. And if the home office no longer exists, what is the status of a letter of credit given by the home office for the benefit of the home office and all of its branches?

If this litigation involved only ARC and Hugh Wilson, Jr., doing business as Wilson Travel Service, Wilson may have had a defense to the dishonored checks drawn by Abbott. But this case involves only ARC and the bank, based upon the letter of credit issued by the bank to ARC's predecessor in interest. The only exceptions to the issuer's duty to honor documents which on their face comply with the terms of the credit are (1) the failure of certain doc-

---

**2.** Plaintiff's witness, South, testified (TR. 32) that the application for change of ownership from Hugh Wilson Jr., doing business as Airport Travel Service, was received "in October, or thereabouts, of 1984," transferring the ownership to Wilson Travel Service, Inc., wholly owned by Betty Wilson. He then stated (TR. 33) that "No Home Office can be transferred without also transferring ownership of the branch location," but there is nothing in the Handbook or Passenger Sales Agency Agreement supporting this statement and, as South testified, "We had to resolve that issue before ownership change could take place." In July 1984, ARC had received a Notice of Proposed Change of Ownership and sent to Airport Travel Service in Charleston the forms necessary to effectuate this change, but these forms were never filed. Abbott claims that he signed the forms and sent them on to Wilson. Wilson claims that he never received the forms. On December 18, 1984, ARC made its demand of the Charleston branch for the surrender of the tickets and plates. It was on January 11, 1985, when the branch was officially closed.

uments to conform to certain specified warranties, (2) the presentment of "forged" or "fraudulent" documents, and (3) there is "fraud in the transaction." Code of Laws of South Carolina, Vol. 12, § 36–5–114(2); *O'Grady v. First Union Nat. Bank,* 296 N.C. 212, 250 S.E.2d 587, 600 (1978). It is fundamental that the letter of credit contract, unless express conditions are incorporated therein, be completely independent of both the credit agreement between the issuing bank and its customer and the contract of sale between the beneficiary and the customer. *Consolidated Sales Co. v. Bank of Hampton Roads,* 193 Va. 307, 68 S.E.2d 652 (1952).

This leaves for determination whether ARC was guilty of "fraud in the transaction" when it effectively did away with the home office prior to closing down the branch office. It is conceded that Wilson never told the bank, nor did the bank inquire, as to whether the letter of credit was confined to the operation of the Summerville home office. The letter of credit was issued on the basis of Wilson's credit with the banking institution and the letter of credit did not limit its effect to the Summerville office. As stated in *Decatur Bank v. St. Louis Bank,* 21 Wall. (88 U.S.) 294 22 L.Ed. 560 (1874), where the letter referred only to the shipments of *cattle,* but the drafts sued on were against shipments of *hogs:*

> Like all other contracts it must receive the construction which is most probable and natural under the circumstances, so as to attain the object which the parties to it had in contemplation in making it.

Unless otherwise specified the customer (Wilson) bears as against the issuer all risks of transmission and reasonable translation or interpretation of any message relating to a credit. Code of Laws of South Carolina, Vol. 12, §§ 36–5–107(4), 36–5–109(1).

Because of the underlying Sales Agency Agreement, I feel that ARC properly concluded that the Letter of Credit would remain in effect until the branch office had been officially closed by the removal of all plates and tickets by ARC and that, during the effective dates as of the letter of credit, Wilson remained liable for Abbott's defaults, as Wilson knew, or should have known, that the letter of credit covered any branch office which he owned insofar as the ARC records were concerned; there having been a specific requirement that any change of ownership would have to be approved by ARC. This reasoning clearly appears to be within the intention of Wilson and ARC. Thus, I conclude that the acts of ARC fall short of constituting "fraud in the transaction." *Itek Corp. v. First Nat'l. Bank of Boston,* 730 F.2d 19 (1st Cir.1984). As pointed out by the majority, whatever ARC did, or failed to do, is not so egregious in nature as to vitiate the entire underlying transaction so that the "legitimate purposes of the independence of the issuer's obligation would no longer be served."

### DAMAGES

It is true that § 36–5–115(1) of the Code of Laws of South Carolina does provide for the recovery of the "face amount of the draft or demand together with incidental damages under § 36–2–710 on seller's incidental damages and interest...." In this case ARC drew its draft in the sum of $50,000 under the theory that future losses, in addition to the $18,827.80, may be discovered. The amount sued for was $18,827.80, which was later increased, by order of court, to $25,243.38. This latter figure was the "demand" of ARC. While the letter of credit did provide the language quoted in the majority opinion, the action before the court is for the wrongful dishonor of the draft drawn on the letter of credit, and not an action on the letter of credit itself. Moreover, to permit a judgment for $50,000 (the face amount of the draft), together with incidental damages and interest, would result in the bank paying at least $50,000 to ARC, and giving ARC the privilege of holding this sum for a period of six months, without interest, before repaying the bank the difference between the amount demanded and the face amount of the draft in the sum of $50,000. Where the "demand" is less than the "face amount of the draft," I must conclude that

the amount sued for is controlling. On the subject of incidental damages, the majority makes no suggestion as to whether this includes attorneys' fees although it is clear from the record that ARC is claiming same. The letter of credit makes no mention of attorneys' fees. While South Carolina law may be to the contrary, a case arising under similar circumstances involving Tennessee law held that attorneys' fees are not recoverable. *Bossier Bank & Trust v. Union Planters Nat. Bank,* 550 F.2d 1077, 1079 (see Appendix B, pp. 1083, 1084) (6th Cir.1977).

For the foregoing reasons, I respectfully dissent from that portion of the majority opinion which deals with the damage issue. I concur on the issue of liability for the amount claimed in the complaint as amended.