**SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.**

[209 N.C. App. 564 (2011)]

SPEEDWAY MOTORSPORTS INTERNATIONAL LTD., Plaintiff v. BRONWEN ENERGY TRADING, LTD., BRONWEN ENERGY TRADING UK, LTD., DR. PATRICK DENYEFA NDIOMU, BNP PARIBAS (SUISSE) SA, BNP PARIBAS S.A., SWIFT AVIATION GROUP, INC., SWIFT AIR, LLC, SWIFT AVIATION GROUP, LLC, AND SWIFT TRANSPORTATION CO., INC., Defendants

No. COA09-558

(Filed 15 February 2011)

**Jurisdiction— forum selection clause—letter of credit transactions independent**

The trial court did not err by denying defendant French Bank's motion to dismiss plaintiff's claims based on a forum selection clause contained in a supplemental guarantee requiring that all litigation take place in Geneva, Switzerland. Defendant conceded that no agreement existed between the two parties containing a forum selection clause even though defendant contended that it should be deemed a third-party beneficiary. Contracts relating to a letter of credit transaction are independent, and thus, the supplemental agreement from plaintiff to defendant Swiss Bank was separate and distinct from the demand guarantee from defendant Swiss Bank to defendant French Bank.

Appeal by defendant from order entered 21 January 2009 by Judge Albert Diaz in Mecklenburg County Superior Court. Heard in the Court of Appeals 28 October 2009.

*Parker Poe Adams & Bernstein LLP, by Michael G. Adams and William L. Esser IV, for plaintiff-appellee.*

*Bell, Davis & Pitt, P.A., by William K. Davis, Edward B. Davis, and Michael D. Phillips, for defendant-appellant BNP Paribas S.A.*

GEER, Judge.

Defendant BNP Paribas S.A. ("BNPP France") moved to dismiss claims asserted against it by plaintiff Speedway Motorsports International Ltd. ("SMIL") on the grounds that SMIL was bound by a forum selection clause requiring that all litigation take place in Geneva, Switzerland. BNPP France appeals from the trial court's denial of that motion. BNPP France concedes that no agreement

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 564 (2011)]

exists between it and SMIL containing a forum selection clause, but contends that it should be deemed a third party beneficiary of a contract containing the Geneva forum selection clause.

Because this commercial dispute arises out of letter of credit transactions, we are bound by the well-established principle that contracts related to a letter of credit transaction are independent. We cannot accept BNPP France's invitation that we view two contracts as "intertwined" despite the controlling law that they are "independent." We, therefore, affirm the trial court's denial of BNPP France's motion to dismiss.

## Facts

In 2006, SMIL, which is "in the business of petroleum products transactions," opened an account with BNP Paribas (Suisse) SA ("BNPP Suisse") to conduct that business. This case arises out of SMIL's use of its BNPP Suisse account in connection with a series of contracts pursuant to which SMIL agreed to guarantee lines of credit issued to finance petroleum purchases by other parties during 2007.

In early 2007, defendants Swift Aviation Group, Inc., Swift Air, LLC, Swift Aviation Group, LLC, and Swift Transportation Co., Inc. (collectively "Swift") were attempting to negotiate a long-term supply contract with Kuwait Petroleum Corporation ("KPC") pursuant to which Swift would purchase petroleum products from KPC. KPC was not, however, willing to enter into a long-term business relationship with Swift until Swift had proven its ability to successfully execute shorter-term spot contracts.

Upon the advice of BNPP France, Swift engaged defendants Bronwen Energy Trading, Ltd. and Bronwen Energy Trading UK, Ltd. (collectively "Bronwen") to assist Swift in executing the spot contracts with KPC. SMIL, which is headquartered in Charlotte, North Carolina, agreed to provide Bronwen with the financial assistance needed to obtain letters of credit for the purchase of the oil under the spot contracts.

On 12 July 2007, Bronwen and SMIL entered into an agreement relating to the delivery of 80,000 metric tons of Jet A-1 ("the First Oil Contract"). Under the First Oil Contract, SMIL agreed to provide BNPP France with a guarantee of $12,750,000.00 to allow Bronwen to secure from BNPP France one or more letters of credit to effectuate the purchase of the Jet A-1 from KPC. SMIL and Bronwen also agreed: "The funded amount guaranteed will be maintained in SMIL's account

566                IN THE COURT OF APPEALS

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 564 (2011)]

with [BNPP Suisse]. SMIL will execute such document(s) as reasonably required by [BNPP France] to effectuate the guarantee of the funded amount."

To fulfill its obligations under the First Oil Contract, SMIL executed a guarantee ("the Corporate Guarantee") to BNPP France later that day. The next day, 13 July 2007, SMIL's president, William R. Brooks, also emailed the Corporate Guarantee to BNPP Suisse. BNPP France rejected as insufficient SMIL's Corporate Guarantee on 13 July 2007 and requested that SMIL instead issue instructions to BNPP Suisse to deliver a first demand guarantee to BNPP France.

Accordingly, later that day, 13 July 2007, SMIL sent instructions ("the First Instructions") to BNPP Suisse to issue a first demand guarantee of $11,750,000.00 in favor of BNPP France with respect to the fulfillment of the First Oil Contract. The First Instructions stated: "[Bronwen] has a financing facility for principal amount of $100,000,000 USD which has been granted by [BNPP France] pursuant to an agreement dated dated [sic] 13 December 2006 (the 'Credit Facility'). SMIL has a business relationship with [Bronwen] pursuant to a separate agreement, a true and correct copy of which is attached hereto as Exhibit A, and which is incorporated herein by reference. The Guarantee is to be issued solely with respect to any amounts drawn by [Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of Exhibit A. SMIL will maintain a sufficient amount in its account with [BNPP Suisse] to satisfy the Guarantee." Exhibit A was a copy of the First Oil Contract executed the day before on 12 July 2007.

After SMIL sent the First Instructions to BNPP Suisse, but still on 13 July 2007, SMIL and Bronwen entered into an amended oil contract ("Amended Oil Contract"), which, by its terms, "supersede[d]" the First Oil Contract executed the previous day. The Amended Oil Contract reduced to $11,750,000.00 the amount guaranteed by SMIL to BNPP France for Bronwen's benefit. Like the First Oil Contract, it provided that the guaranteed amount would be maintained in SMIL's account with BNPP Suisse.

Three days later, on 16 July 2007, BNPP Suisse acknowledged receipt of the First Instructions, but it informed SMIL that it "need[ed] a request with the actual wording of the guarantee" BNPP Suisse was to issue to BNPP France, as opposed to the more general wording of the First Instructions. BNPP Suisse included a draft of a first demand guarantee for SMIL's review. In addition to referencing the purchase by Bronwen of 80,000 metric tons of Jet A-1, as gov-

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 564 (2011)]

erned by the First Oil Contract and the Amended Oil Contract, the draft also referred to a purchase of 60,000 metric tons of Gasoil from KPC. The last line of the first demand guarantee stated: "This guarantee is subject to Swiss Law, place of jurisdiction is Geneva."

Later that day, SMIL emailed BNPP Suisse a revised version of the first demand guarantee. The revised version was substantially similar to BNPP Suisse's draft. It confirmed that SMIL agreed to be responsible for Bronwen's repayment of the $11,750,000.00 credit issued to KPC, pursuant to the Amended Oil Contract, and it included the Geneva forum selection clause. It deleted the reference to the 60,000 metric tons of Gasoil that was not part of the Amended Oil Contract. SMIL's president, Mr. Brooks, signed the document after adding the following sentence: "All claims are to be sent to my attention at [Mr. Brooks' email address], and by fax to [Charlotte, North Carolina fax number]." SMIL also noted in its email attaching the revised "guarantee form" that it had also attached "a superseding agreement [the Amended Oil Contract] between [SMIL] and [Bronwen] that is to be used in substitution for the Exhibit A [SMIL] originally sent to [BNPP Suisse]."

On appeal, the parties do not agree on the purpose or effect of the 16 July 2007 draft of the first demand guarantee sent by Mr. Brooks to BNPP Suisse. BNPP Suisse refers to the document as an actual guarantee by SMIL in favor of BNPP Suisse. SMIL insists that this draft of the first demand guarantee was merely an "Approval Document" that was approving the form of the first demand guarantee BNPP Suisse was going to send to BNPP France. SMIL contends that this Approval Document, which contained the Geneva forum selection clause, was not intended to supersede the First Instructions. In SMIL's second amended complaint, however, SMIL referred to the 16 July 2007 document as the "Supplemental Guarantee." For purposes of this opinion, we will adopt SMIL's description of this document and refer to it as the "Supplemental Guarantee."

Meanwhile, also on 16 July 2007 (but apparently before BNPP Suisse received SMIL's response with the Supplemental Guarantee), BNPP Suisse went ahead and issued a first demand guarantee to BNPP France by which BNPP Suisse promised that it would be responsible for Bronwen's repayment of the letters of credit to BNPP France. The first demand guarantee referenced both the 80,000 metric tons of Jet A-1 and the 60,000 metric tons of Gasoil, and it contained the Geneva forum selection clause.

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 564 (2011)]

Subsequently, on 19 July 2007, Bronwen and SMIL entered into a second oil contract ("the Second Oil Contract"). Under the Second Oil Contract, SMIL agreed to provide a first demand guarantee to BNPP France for an additional $4,000,000.00 to allow Bronwen to secure letters of credit to effectuate the purchase of 68,000 metric tons of Gasoil. Like the First and Amended Oil Contracts, it provided that the guaranteed amount would be maintained in SMIL's account with BNPP Suisse.

On 23 July 2007, pursuant to the Second Oil Contract, SMIL sent BNPP Suisse new instructions ("the Second Instructions") directing BNPP Suisse to increase the amount of the first demand guarantee in favor of BNPP France by $4,000,000.00, bringing the total amount to $15,750,000.00. The Second Instructions stated: "SMIL has new business with [Bronwen] pursuant to a separate agreement [the Second Oil Contract], a true and correct copy of which is attached hereto as Exhibit A, and which is incorporated herein by reference. The additional $4,000,000 of the Guarantee is to be issued solely with respect to any amounts drawn by [Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of Exhibit A."

Approximately two weeks later, on 7 September 2007, Bronwen and SMIL entered into yet another contract ("the Third Oil Contract"). Under the Third Oil Contract, SMIL agreed to provide a first demand guarantee to BNPP France in the amount of $12,000,000.00 to allow Bronwen to secure letters of credit to effectuate the purchase of three shipments of 65,000 metric tons of Gasoil each. Like the previous Oil Contracts, the Third Oil Contract provided that the guaranteed amount would be maintained in SMIL's account with BNPP Suisse.

The same day, SMIL sent BNPP Suisse instructions ("the Third Instructions") directing BNPP Suisse to reduce the amount of the first demand guarantee to $12,000,000.00. The Third Instructions stated: "SMIL has new business with [Bronwen] pursuant to a separate agreement [the Third Oil Contract], a true and correct copy of which is attached hereto as Exhibit A, and which is incorporated herein by reference. The $12,000,000 Guarantee is to be issued solely with respect to any amounts drawn by [Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of Exhibit A."

A week later, on 14 September 2007, SMIL sent BNPP Suisse "updated" instructions ("the Fourth Instructions"). The Fourth Instructions reiterated the $12,000,000.00 amount of the first demand

IN THE COURT OF APPEALS          569

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 564 (2011)]

guarantee and stated: "This Guarantee will cover all current business SMIL has with [Bronwen] pursuant to separate agreements [the Amended, Second, and Third Oil Contracts], true and correct copies of which are attached hereto as Exhibit A, and which are incorporated herein by reference. The $12,000,000 Guarantee is to be issued solely with respect to any amounts drawn by [Bronwen] pursuant to the Credit Facility in [Bronwen's] fulfillment of the contracts attached as Exhibit A."

In early November 2007, BNPP France determined that losses related to the Oil Contracts exceeded $17,000,000.00. BNPP France notified Bronwen and SMIL that BNPP France believed it had a right to draw on SMIL's account at BNPP Suisse to cover its losses. SMIL disputed this claim, reminding BNPP France that the first demand guarantee only covered letters of credit issued to effectuate purchase of oil under the Oil Contracts and insisting that Bronwen's debt was not related to the purchase price of oil under the pertinent Oil Contracts. Because BNPP France nonetheless maintained that it had a right to draw on the first demand guarantee, SMIL announced on 6 November 2007 that it was terminating the first demand guarantee. The next day, however, BNPP Suisse notified SMIL that it had received a demand from BNPP France. Despite SMIL's protest, BNPP Suisse paid BNPP France $12,000,000.00 on 9 November 2007 and immediately debited SMIL's account for that amount.

SMIL filed a complaint on 22 April 2008, an amended complaint on 29 May 2008, and a second amended complaint on 25 September 2008, asserting claims for, *inter alia*, breach of contract against Bronwen and Swift; wrongful honor against BNPP Suisse; fraud and negligent misrepresentation against BNPP France; breach of demand guarantee and conversion against BNPP Suisse and BNPP France; equitable subrogation to BNPP France's claims against Bronwen and Swift; and unfair and deceptive trade practices against all defendants. SMIL also asserted that it was entitled to an accounting from all defendants.

BNPP France moved to dismiss SMIL's claims against BNPP France on the grounds that (1) the court lacked personal jurisdiction over BNPP France, (2) SMIL's claims arose out of an express guarantee that any claims must be litigated in Geneva, Switzerland, and (3) SMIL had failed to state a claim against BNPP France. Before the trial court decided BNPP France's motion, SMIL moved to amend its complaint. The court granted SMIL's motion, and SMIL filed its second

amended complaint on 25 September 2008. BNPP France subsequently filed a revised motion to dismiss, dropping its challenge to personal jurisdiction, but maintaining that the suit must be litigated in Geneva, Switzerland and that SMIL had failed to state a claim against BNPP France.

On 21 January 2009, the Business Court entered an order granting in part and denying in part BNPP France's motion to dismiss. The order contained no findings of fact but decreed that the court:

1. DENIES the Motion to Dismiss based on the purported existence of mandatory forum selection provisions in two contract documents requiring trial of the parties' dispute in Geneva, Switzerland, as the Court (without deciding whether, in fact, the provisions are mandatory) concludes that these parties are not bound by these provisions;

2. GRANTS the Motion to Dismiss for failure to state a claim as to [SMIL's] Fourth Claim for Relief alleging breach of contract, as the Court finds as a matter of law that [SMIL] has failed to allege the existence and breach of any contract between [SMIL] and [BNPP France]; and

3. DENIES the Motion to Dismiss for failure to state a claim as to the remaining claims alleged by [SMIL].

BNPP France appealed the order to this Court.

### Discussion

On appeal, BNPP France contends only that the trial court erred in concluding that SMIL is not bound by the Geneva forum selection clause contained in the Supplemental Guarantee.[1] Although SMIL vigorously argues that the Supplemental Guarantee was not a guarantee from SMIL to BNPP Suisse but rather was simply approving the form of the guarantee to be issued by BNPP Suisse to BNPP France, we assume, without deciding, for purposes of this appeal, that this document was a binding guarantee provided by SMIL to BNPP Suisse.

---

1. Although this appeal is interlocutory, it is properly before the Court because it involves a substantial right that would be lost in the absence of an immediate appeal. *See Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 641, 574 S.E.2d 31, 33 (2002) ("North Carolina case law establishes firmly that an appeal from a motion to dismiss for improper venue based upon a jurisdiction or venue selection clause dispute deprives the appellant of a substantial right that would be lost." (internal quotation marks omitted)).

IN THE COURT OF APPEALS 571

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 564 (2011)]

The Supplemental Guarantee was emailed by Mr. Brooks to BNPP Suisse in Geneva. It initially stated: "This is to confirm you [sic] that we hereby irrevocably guarantee and agree to be answerable and responsible towards you for the due repayment by [Bronwen] of the Credit Facilities limited to the issuance of one or several documentary credits for the purchase from Kuwait Petroleum Corporation ("KPC") of 80'000 metric tons +/- 10 pct of Jet A-1 (Contract reference S/MD/K/080/07) you have granted or will grant to them in your books . . . ." The Supplemental Guarantee was limited to $11,750,000.00 and further provided that payment of any amount claimed up to that limit would be made "in accordance with your instructions without any objection or entering into an argument and without any previous notice of dishonour or any other notice, upon receipt by us of your first demand by duly authenticated swift message certifying that the amount you are claiming from us on the strength of our present guarantee is due to you by [Bronwen] as a result of their failure to repay you said sum within the time fixed by you."

The Supplemental Guarantee stated that it would remain valid until 5:00 p.m. on 15 September 2007 and that "in the event of no claim being received by us hereunder on or prior to 15 September 2007, our present undertaking will be of right null and void after that date."[2] All claims were to be sent to "my attention" at an email address belonging to Mr. Brooks, SMIL's president, and by fax to a Charlotte, North Carolina fax number. The Supplemental Guarantee closed with a final provision: "This guarantee is subject to Swiss Law, place of jurisdiction is Geneva[.]" It was then signed by Mr. Brooks.

There is no dispute that the Supplemental Guarantee, if a binding agreement, was an agreement between SMIL and BNPP Suisse. BNPP France chose to reject SMIL's Corporate Guarantee made directly to BNPP France and insisted, instead, that SMIL arrange for BNPP Suisse to issue a first demand guarantee to BNPP France. BNPP France explains in its brief: "SMIL executed a guarantee to [BNPP] Suisse, which, in turn, issued a guarantee to BNPP France. The Guarantees contain identical forum selection and choice of law provisions that state clearly and unequivocally: 'THIS GUARANTEE IS SUBJECT TO SWISS LAW, PLACE OF JURISDICTION IS GENEVA.' "

BNPP France concedes that SMIL did not enter into any agreement directly with BNPP France that included a forum selection clause.

_____

2. The parties disagree regarding the effect of the expiration date. We again assume, without deciding, that the Supplemental Guarantee remained in effect.

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 564 (2011)]

BNPP France argues, however, that it was entitled to the benefit of the Geneva forum selection clause in the Supplemental Guarantee because the Supplemental Guarantee and the First Demand Guarantee from BNPP Suisse to BNPP France were "inextricably intertwined, manifesting SMIL's intent and expectation to be bound by the Geneva forum selection clause contained in both Guarantees."

Understanding the nature of demand guarantees is critical to a resolution of BNPP France's appeal. A "guarantee" by a bank—a term primarily used in international commerce and banking—is the functional equivalent of a standby letter of credit. *See* David J. Barru, *How to Guarantee Contractor Performance on International Construction Projects: Comparing Surety Bonds with Bank Guarantees and Standby Letters of Credit,* 37 Geo. Wash. Int'l L. Rev. 51, 65 (2005) ("The term 'guarantee' is ubiquitous in international commerce and banking. It refers to an instrument that is functionally equivalent to a standby letter of credit." (internal quotation marks omitted)). As one commentator has explained, "[t]here are a multitude of names that refer to these bank-issued undertakings, including bank guarantees, independent guarantees, independent bank guarantees, international bank guarantees, *demand guarantees,* international demand guarantees, simple demand guarantees, *first-demand guarantees,* performance guarantees, and, in Latin America, guarantia." *Id.* (emphasis added).

BNPP Suisse's "first demand guarantee" to BNPP France was a bank guarantee to which we apply the law of letters of credit. *See* N.C. Gen. Stat. § 25-5-102 cmt. 6 (2009) ("[C]ertain documents labelled [sic] 'guarantees' in accordance with European (and occasionally, American) practice are letters of credit."). *See also* Barru, *supra,* at 63 ("Courts and commentators generally agree that the law of letters of credit applies to bank guarantees.").

As this Court acknowledged 30 years ago, letters of credit "have been used for centuries to facilitate commercial transactions." *Sunset Invs., Ltd. v. Sargent,* 52 N.C. App. 284, 286, 278 S.E.2d 558, 560, *disc. review denied,* 303 N.C. 550, 281 S.E.2d 401 (1981). "The very object of a letter of credit is to provide a near foolproof method of placing money in its beneficiary's hands when he complies with the terms contained in the letter itself—when he presents, for example, a shipping document that the letter calls for or (as here) a simple written demand for payment. Parties to a contract may use a letter of credit in order to make certain that contractual disputes wend their way

SPEEDWAY MOTORSPORTS INT'L, LTD. v. BRONWEN ENERGY TRADING, LTD.

[209 N.C. App. 564 (2011)]

towards resolution with money in the beneficiary's pocket rather than in the pocket of the contracting party." *Itek Corp. v. First Nat'l Bank of Boston*, 730 F.2d 19, 24 (1st Cir. 1984).

This Court has explained: "A letter of credit is an engagement by a bank, a finance company or other issuer made at the request of its customer or some other person who seeks to secure an obligation to a third person which will arise in the future. The engagement is that if certain things are done, either by way of presentation of pieces of paper or simply by making a demand for payment of a draft or acceptance, payment or acceptance will take place." *Sunset Invs.*, 52 N.C. App. at 286-87, 278 S.E.2d at 560-61. Typically, a letter of credit transaction involves three contracts: "1) the contract between the issuer (bank) and the account party (customer) for the issuance of the credit; 2) the letter of credit itself, a contract between the issuer and the beneficiary; and 3) the underlying agreement between the beneficiary and the account party." *Id.* at 287, 278 S.E.2d at 561.

In this case, the first contract was between BNPP Suisse and its customer/account-holder, SMIL. BNPP Suisse agreed to issue the letter of credit to BNPP France on behalf of SMIL. BNPP Suisse chose to ensure that it would be reimbursed by SMIL for any payment made to BNPP France on the letter of credit by obtaining the Supplemental Guarantee from SMIL. BNPP Suisse then entered a contract with BNPP France (the second contract) by issuing the demand guarantee (or letter of credit) to BNPP France, the beneficiary. BNPP France, in turn, issued a letter of credit to finance the Oil Contracts (the third contract)—an agreement conditioned on SMIL's securing that letter of credit by having BNPP Suisse issue the demand guarantee to BNPP France.

As this Court recognized in *Sunset Invs.*, "one bright star" exists regarding letter of credit transactions: "[T]he basic aspect of the successful use of letters of credit lies in recognizing at the threshold that *every letter of credit involves separate and distinct contracts*; and that the contract between the issuing bank and the beneficiary to pay money to the beneficiary upon demand (and documentation if called for) must be kept chaste [and] independent of the underlying contract between the purchaser of the letter and the beneficiary." *Id.* at 288, 278 S.E.2d at 561 (emphasis added). This "basic aspect," *id.*, of letters of credit is known as the "independence principle." *See also* Barru, *supra*, at 77-78 ("The independence principle, also referred to as the 'autonomy principle' is at the core of letter of credit or bank guarantee law.").

Phrased differently, this principle establishes that:

> the letter of credit or bank guarantee is independent of the underlying contractual commitment—that is, the transaction that the credit is intended to secure—between the applicant and the beneficiary; *the credit is also independent of the relationship between the bank and its customer, the applicant.* The issuing bank is required to pay the beneficiary on proper demand, made in strict conformance with the terms of the guarantee or letter of credit, regardless of actual events surrounding the underlying contract between the beneficiary and the applicant. The bank must likewise pay on proper demand regardless of any dispute with its customer, the applicant, or concern that the customer may default on the underlying reimbursement agreement.

Barru, *supra,* at 78 (emphasis added). This principle has also been included in the Uniform Commercial Code: "Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or non-performance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary." N.C. Gen. Stat. § 25-5-103(d) (2009).

In this case, by insisting that SMIL arrange with BNPP Suisse to have a demand guarantee—or letter of credit—issued from BNPP Suisse to BNPP France, BNPP France obtained "the certainty and speed of payment" that letters of credit ensure. N.C. Gen. Stat. § 25-5-103 cmt. 1. BNPP France would be paid—and was paid—by BNPP Suisse regardless whether BNPP Suisse was reimbursed by SMIL or of the status of the Oil Contracts. *See* Barru, *supra,* at 78 ("The bank must likewise pay on proper demand regardless of any dispute with its customer, the applicant, or concern that the customer may default on the underlying reimbursement agreement."). BNPP France thus benefitted from the independence principle.

Now, however, in order to take advantage of the forum selection clause in SMIL's contract with BNPP Suisse, BNPP France argues that the SMIL/BNPP Suisse contract and the BNPP Suisse/BNPP France contract are "inextricably intertwined." We cannot reconcile the "independence principle" with BNPP France's "intertwining" contract theory. These two contracts—because they are part of a letter of credit transaction—are "separate and distinct contracts." *Sunset Invs.,* 52 N.C. App. at 288, 278 S.E.2d at 561. Any rights and obligations

of BNPP Suisse to BNPP France— by virtue of the demand guarantee— "are independent of the existence" of the contract or arrangement between SMIL and BNPP Suisse. N.C. Gen. Stat. § 25-5-103(d).

The cases cited by BNPP France as permitting a non-signatory to a contract to enforce a provision in that contract—a third-party beneficiary theory—do not involve the independence principle. BNPP France urged in oral argument that the independence principle is limited to prohibiting BNPP France from refusing to honor its letter of credit because of a dispute between SMIL and Bronwen/Swift. BNPP France has provided this Court with no authority—either in its brief or through a Memorandum of Additional Authority—supporting its contention that the contracts comprising a letter of credit transaction are independent for some purposes, but are not for other purposes. In the absence of such authority, we are unwilling to risk undermining letter of credit transactions.

As the commentary to North Carolina's version of the Uniform Commercial Code warns, "Only staunch recognition of [the independence] principle by the issuers *and the courts* will give letters of credit the continuing vitality that arises from the certainty and speed of payment under letters of credit. To that end, it is important that the law not carry into letter of credit transactions rules that properly apply only to secondary guarantees or to other forms of engagement." N.C. Gen. Stat. § 25-5-103 cmt. 1 (emphasis added). *See also Universal Marine Ins. Co. v. Beacon Ins. Co.*, 581 F. Supp. 1131, 1138 (W.D.N.C. 1984) (noting that purpose of "independence principal" is "to preserve the usefulness of the letter of credit as a means of facilitating commercial dealings").

Accordingly, we reject BNPP France's contention that it may be a third party beneficiary of the Supplemental Guarantee's Geneva forum selection clause. We hold that the independence principle governing letters of credit dictates that the Supplemental Guarantee from SMIL to BNPP Suisse is separate and distinct from the demand guarantee from BNPP Suisse to BNPP France. BNPP France has, therefore, failed to demonstrate that SMIL is subject to any forum selection clause with respect to its claims against BNPP France. The trial court properly denied BNPP France's motion to dismiss based on that clause.

Affirmed.

Judges ROBERT C. HUNTER and CALABRIA concur.